**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Danny M. NEIGHBORS, Defendant–Appellant.**

No. 92–5221.

United States Court of Appeals, Tenth Circuit.

April 29, 1994.

---

Kenneth P. Snoke, Asst. U.S. Atty. (F.L. Dunn, III, U.S. Atty., with him on the brief), Tulsa, OK, for plaintiff-appellee.

Stanley D. Monroe, Tulsa, OK, for defendant-appellant.

Before MOORE, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and ROGERS, Senior District Judge.*

McWILLIAMS, Senior Circuit Judge.

Danny M. Neighbors was charged in a 45–count indictment with various drug violations. In counts 1 through 15, Neighbors was charged with knowingly and intentionally possessing, with an intent to distribute and illegally dispense, Dilaudid, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) (1988). Each count was based on a separate and different transaction occurring between January 1, 1990, and March, 1991.

In counts 16 through 42, Neighbors was charged with knowingly and intentionally acquiring controlled substances, namely, Valium, a Schedule IV controlled substance, and Dilaudid, a Schedule II controlled substance, by misrepresentation, deception and subterfuge, in violation of 21 U.S.C. §§ 843(a)(3) and 843(c) (1988). Each count was based on a separate and different transaction occurring also between January 1, 1990, and March, 1991.

In count 43, Neighbors was charged with knowingly and intentionally omitting, from January 1, 1990, to March, 1991, material information from records and documents required to be kept by 21 U.S.C. § 827(a)(3) (1988), in that he, as the chief pharmacist for Morton Comprehensive Health Service, Inc.

---

* Honorable Richard D. Rogers, Senior District    Judge, District of Kansas, sitting by designation.

Clinic, did not maintain, on a current basis, a complete and accurate record of the controlled substances, Dilaudid and Valium, which were received, sold, delivered, dispensed, or otherwise disposed of by him, in violation of 21 U.S.C. §§ 827(a)(3), 843(a)(4)(A), and 843(c) (1988).

In count 44, Neighbors was charged with knowingly and intentionally embezzling, misapplying and otherwise converting to his own use property valued at $5,000, or more, owned by, and under the care, custody and control of Morton Comprehensive Health Services, Inc., an organization which received federal financial assistance in excess of $10,-000 for the one year period beginning January 1, 1990, and ending December 31, 1990, in violation of 18 U.S.C. § 666(a)(1)(A) (1988). Count 45 charged a similar embezzlement during the year beginning January 1, 1991, and ending December 31, 1991.

A jury convicted Neighbors on all 45 counts, and he was sentenced to 78 months imprisonment on each of the first 15 counts, as well as on counts 44 and 45, and 28 months imprisonment on counts 16 through 43, all to be served concurrently. He was also sentenced to a period of supervised release, a special monetary assessment in the amount of $2,250 and ordered to make restitution to Morton in the amount of $35,040. Neighbors now appeals his conviction and sentence.

On appeal, counsel asserts three grounds for reversal: (1) the evidence is insufficient to support the conviction of Neighbors on any of the 45 counts; (2) the district court erred by refusing to allow Neighbors "to present relevant evidence tending to show his innocence"; and (3) the district court erred in its application of the Sentencing Guidelines by its inclusion of "other drugs" than those charged in the indictment as being "relevant conduct." We find no error.

### I. *Sufficiency of the Evidence*

■ Morton Comprehensive Health Services, Inc. ("Morton") of Tulsa, Oklahoma, is a charitable, tax exempt community health organization that receives funding in the form of grants from the federal government. The Morton organization is comprised of a medical clinic, a pharmacy located therein, and a homeless clinic operated by Morton on Salvation Army premises. For some ten years Neighbors was the chief pharmacist at the Morton clinic pharmacy continuing until he resigned in March, 1991, as the ostensible result of his dissatisfaction with his rate of pay.

The government's theory of the case was that for a number of years, including the period from January, 1990, to and through March, 1991, Neighbors, the chief pharmacist and only full-time pharmacist at Morton, ordered various drugs, including Dilaudid and Valium, from Bergen–Brunswig, a drug supplier in Tulsa, Oklahoma, which orders were filled by Bergen–Brunswig by either delivery to Morton or via pick up by Neighbors and others from Morton, and that thereafter Neighbors possessed and converted the Valium and Dilaudid for his own purposes. The government's evidence was largely circumstantial, i.e., there was no "eyewitness" nor did Neighbors, when questioned by FBI agents, "confess" to any criminal act. However, there was evidence that several audits had been made of Morton's and Bergen–Brunswig's records which showed rather conclusively, and dramatically, that Bergen–Brunswig delivered Valium and Dilaudid to the Morton pharmacy which greatly exceeded Valium or Dilaudid dispensed by the pharmacy, or "on hand" at or about the time Neighbors quit his employment at Morton.

In support of its theory of the case, the government called about 32 witnesses. Much of the testimony involved the audits of the records of Morton pharmacy made by three separate investigative agencies. The initial audit was conducted by the Oklahoma Bureau of Narcotics and Dangerous Drugs ("Oklahoma Bureau"). In November, 1991, the Drug Enforcement Administration ("DEA") confiscated most of Morton pharmacy's prescriptions and performed its own audit. Later, the FBI took custody of the confiscated prescriptions, and performed an independent audit.

In each of the three audits, the investigators counted all the scheduled drugs on hand at the pharmacy. They then went through

the prescriptions filled at Morton pharmacy during the indictment period, and compared the drugs ordered by prescriptions with the invoices from both Morton and Bergen–Brunswig showing the amount and type of drugs ordered and received by Morton pharmacy from Bergen–Brunswig. The FBI went through all of the prescriptions filled at the pharmacy from December 29, 1989, to April 2, 1991, a total of some 24,900 prescriptions. Agent Josh Nixon of the FBI testified that since the prescriptions were numbered sequentially, he and his assistants were able to physically locate and account for all but four prescriptions during that time.

The audits revealed that *no* prescriptions were filled by Morton pharmacy for Dilaudid tablets during the relevant time period, and that although a few prescriptions were found for Valium tablets, those prescriptions contained a pharmacy notation indicating that they had been filled with the generic equivalent of Valium, diazepam. The audits also revealed that, during this same time period, January 1, 1990, to March 31, 1991, Morton pharmacy had ordered and received some 6,500 4-milligram tablets of Dilaudid and over 135,000 5 and 10-milligram Valium tablets from Bergen–Brunswig.[1]

Agents who were involved in the audits for each investigative agency were called as witnesses for the government and testified to the results of those audits, including Doye A. Tilley, an agent with the Oklahoma Bureau; Ruth A. Carter, an investigator with the DEA; and, for the FBI, Michael J. Wysocki, Janetta M. Maxwell, Josh Nixon and J.C. Carabajal (an agent with Health and Human Services who worked in concert with the FBI).

In further support for its case, the government called two witnesses who were Bergen–Brunswig employees. Both witnesses explained Bergen–Brunswig's business practices for distributing pharmaceuticals to their customers. Bill Lewallen identified the business records of Bergen–Brunswig (including the work orders, invoices, delivery and pickup logs, DEA 222 forms, and monthly sales summaries) which confirmed the dispersal of Dilaudid and Valium tablets to Morton pharmacy. Dana Shreffler testified that Neighbors would often personally pick up Morton's drug orders at Bergen–Brunswig's facility.

Other than Neighbors, who was the only full-time pharmacist, there were three part-time pharmacist working at Morton: Everett Lacy, Terry Moorhead, and Darrell Miner. Each of the part-time pharmacists testified for the government. According to their testimony, Morton pharmacy never kept a stock supply of either Valium tablets or Dilaudid tablets during the relevant time period. Furthermore, none of the three saw a prescription for Dilaudid, and none of them ordered Dilaudid or Valium tablets from Bergen–Brunswig during that period.

The government also introduced inventory documents which supported the part-time pharmacists' assertion that Dilaudid and Valium tablets were not stocked at Morton. Under Oklahoma state law, Morton pharmacy was required to submit a yearly inventory of controlled substances to state authorities. One such inventory dated July 12, 1990, which was signed by Neighbors, indicated that Morton pharmacy did not have any Dilaudid in stock. Neighbors co-signed an inventory when he left Morton which also indicated that Morton had no stock supply of Valium tablets or Dilaudid. Additionally, Beverly Myers performed an inventory of Morton's stock medications when she took over as chief pharmacist. She found no Dilaudid, and no Valium tablets.

Once the FBI audit of Morton pharmacy was completed, the FBI obtained a search warrant to search Neighbors' home. The search warrant was executed on September 19, 1991. In a box in Neighbors' basement, the FBI agents found Morton's copy of an invoice notice from Bergen–Brunswig for an order of Dilaudid tablets. Agents Nixon and Carabajal interviewed Neighbors at his home while the search was being conducted.

---

1. Dr. Lucy Moore and Dr. Robert Harris, both Morton physicians, testified that Dilaudid is prescribed only for persons suffering severe or extreme pain, such as terminally ill cancer patients.

Dr. Moore further testified that it was "highly unusual to prescribe [Dilaudid] in routine practice." (*See* Tr. Vol. IV at 125 and Vol. V at 210.)

At trial, Agent Patrick Lynch testified as to what the search disclosed, and Agent Nixon testified to the statements made by Neighbors during his interview. According to Agent Nixon's testimony, Neighbors denied any wrongdoing, and said that he had dispensed Dilaudid and Valium tablets pursuant to prescription until the day he left Morton pharmacy. Neighbors gave the names of three Morton physicians who he said could verify that Dilaudid was being prescribed and dispensed at Morton. As part of the government's case in chief, and to contradict the defendant's explanation of events, the government called the three Morton physicians whom Neighbors had identified. Each of the physicians, either by trial testimony or by stipulation, stated that he or she had never prescribed Dilaudid, and had prescribed Valium only rarely.

At trial, Neighbors exercised his constitutional right not to testify. Counsel did call five defense witnesses. A building and grounds manager at Morton testified that a door on the pharmacy was not secure and that on occasion he had noted that pharmacy records were placed in the medical records department. Another witness, a drug and alcohol abuse counselor at the Salvation Army, testified that on several occasions patients at the homeless clinic came to her with Dilaudid pill bottles bearing a prescription label of the Morton pharmacy. Additionally, Neighbors' wife, a former Morton physician, testified that she never saw her husband use drugs or alcohol, and that he never had large sums of money on his person. Another witness testified to the same effect. Art Williams was the remaining witness who testified as a defense witness. More will be said about his testimony later.

Our study of the record convinces us that the verdicts of the jury on all 45 counts are amply supported. Indeed, the government's evidence, though basically circumstantial in nature, is, to us, most convincing, and accordingly we affirm Neighbors' conviction on all counts. In *United States v. Notch*, 939 F.2d 895, 898 (10th Cir.1991), we said that even though so-called direct evidence may be lacking, a criminal conviction can be sustained "solely on circumstantial evidence." And in *United States v. Smith*, 788 F.2d 663, 669 (10th Cir.1986), we opined that circumstantial evidence is entitled to the same weight as that given to direct evidence in determining the sufficiency of the evidence to support a guilty verdict.[2]

## II. *Art Williams*

Art Williams, a professor and director at a substance abuse center located on the grounds of the Morton clinic, was asked why he had asked Neighbors to serve on the board of that facility. An objection on the ground of materiality was sustained, and on appeal, counsel argues that such ruling constitutes reversible error. We disagree.

■ Counsel made an offer of proof that if Williams was permitted to answer his question as to "why," Williams would testify that he asked Neighbors to serve on the board of the substance abuse center because of Neighbors' strong advocacy "against drug and alcohol abuse and substance abuse of any kind." We agree with the district court that the proffered evidence was not material. In any event, the question of whether certain testimony is relevant to an issue before the jury is within the sound discretion of the district court, and we find no abuse of that discretion in the instant case. *United States v. Alexander*, 849 F.2d 1293, 1301 (10th Cir.1988).

## III. *Sentencing Guidelines*

Counsel's final argument is that the district court erred in its application of the Sentencing Guidelines. The basic objection is that the district court in fixing Neighbors' base offense level factored in drugs other than the drugs which formed the bases for the charges in the indictment and the convictions thereof. In this regard, counsel concedes that "other drugs" than those which form the bases for the offenses with which

2. Neighbors relies heavily on *United States v. Bycer*, 593 F.2d 549 (3rd Cir.1979). It is true that in both cases the defendant is a pharmacist. However, the facts and circumstances of this case differ from those in *Bycer*. One important difference for the purpose of this appeal is that the drugs in *Bycer* actually made it into the pharmacy inventory. In any event, we are not controlled by *Bycer*, nor are we particularly persuaded by it.

Neighbors was charged, and convicted, may be considered if they are "relevant conduct," but claims that some were too remote in time and some even beyond the statute of limitations.

Statutes of limitations play no role in the sentencing phase of a criminal proceeding. Section 1B1.3(a)(2) of the Sentencing Guidelines does not limit acts that are " 'part of the same course of conduct or scheme or plan' to the period covered by the statute of limitations." *United States v. Lokey*, 945 F.2d 825, 840 (5th Cir.1991). *See also, United States v. Moore*, 927 F.2d 825, 828 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 205, 116 L.Ed.2d 164 (1991) where the Fifth Circuit stated that there "is no separate statute of limitations beyond which relevant conduct suddenly becomes irrelevant."

The test is whether the earlier drug transactions are "relevant conduct" to the offenses of which Neighbors was convicted.[3] We agree with the district court that they were. Neighbors was the chief pharmacist at Morton for nearly ten years, and the record and the presentence report indicate that for over five years he was engaged in the same type of activity that formed the basis for the indictment. As indicated, the indictment was based, in the main, on events occurring between January, 1990, and March, 1991, but Neighbors was clearly engaged in the same sort of activity for several years prior thereto.[4]

Judgment affirmed.

---

3. § 1B1.3. *Relevant Conduct (Factors that Determine the Guideline Range)*

    (a) *Chapters Two (Offense Conduct) and Three (Adjustments).* Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

    \*    \*    \*    \*    \*    \*

    (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction; ...

United States Sentencing Commission, *Guidelines Manual*, § 1B1.3 (Nov. 1993). *See also* USSG § 1B1.3, comment. (backg'd.): "[I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction *are to be included in determining the offense level* if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." (emphasis added).

4. Counsel also suggests that, in calculating Neighbors' base offense level, the district court ought to have used the weight of Dilaudid's active ingredient, hydromorphone, rather than the gross weight of the Dilaudid tablet. However, the Sentencing Guidelines provide that the weight of the controlled substance in the Drug Quantity Table in USSG § 2D1.1, "refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." USSG § 2D1.1(c) n. \*, and comment. (n. 1). Since a Dilaudid tablet is a mixture of hydromorphone and inert substances, the weight of the entire tablet can be considered under the Guidelines. *See United States v. Killion*, 7 F.3d 927, 935 (10th Cir.1993) (holding that a waste by-product from the drug manufacturing process is a "mixture or substance contain[ing] a detectable amount of a controlled substance ...", and that the weight of the by-product was properly included in calculating base offense level under USSG § 2D1.1), *cert. denied*, —— U.S. ——, 114 S.Ct. 1106, 127 L.Ed.2d 418 (1994).