**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Larry Dwight JAYNES and April Marie Jaynes, Defendants–Appellants.**

**Nos. 95–6009, 95–6026.**

United States Court of Appeals,
Tenth Circuit.

Feb. 5, 1996.

John E. Green, First Assistant United States Attorney (Patrick M. Ryan, United States Attorney, with him on the briefs), Oklahoma City, Oklahoma, for Plaintiff–Appellee.

June E. Tyhurst (Jerome T. Kearney, Assistant Federal Public Defender, Oklahoma City, Oklahoma, on the brief), for Defendant–Appellant April Marie Jaynes.

Stanley S. Parsons, Oklahoma City, Oklahoma, on the brief, for Defendant–Appellant Larry Dwight Jaynes.*

Before HENRY, Circuit Judge, McKAY, Senior Circuit Judge, and JENKINS, Senior District Judge.**

JENKINS, Senior District Judge.

The defendants, April Marie Jaynes and Larry Dwight Jaynes, appeal their convictions on charges arising out of April Jaynes's alleged forgery of certain United States Treasury checks. Ms. Jaynes also appeals her sentence. We affirm.

## I.

April Jaynes's grandfather, Harry C. Jones, was a guard at Tinker Air Force Base in Oklahoma. He retired from federal employment in 1971, after about thirty years of service. Under the civil service retirement plan then in effect, he was to receive a monthly annuity. Shortly thereafter, Mr. Jones died, and his wife, Julia A. Jones, continued to receive the annuity checks until her death in September 1986. Apparently, the United States was not informed of Mrs. Jones's death because it continued to send her an annuity check every month, made payable to "Julia A. Jones." Patricia Lue Jones, Julia's daughter and April's mother, cashed the checks, signing Julia's name to them. Pat Jones died in April 1988. April Jaynes then began negotiating the checks. At first, April deposited the checks in her mother's account, but in February or March 1989 she started depositing them in her own account.

In August 1994, the United States filed a three-count indictment against April and her husband, Larry Jaynes. Count one charged the defendants with forging the name of Julia A. Jones on sixty-four United States Treasury checks totaling $21,415 and dated from May 2, 1988, through July 2, 1993, in violation of 18 U.S.C. §§ 510(a)(1) and 2. Count two charged the defendants with unlawfully passing, uttering and publishing the same checks, in violation of 18 U.S.C. §§ 510(a)(2) and 2. Count three charged the defendants with conspiring to forge, utter and publish the sixty-four Treasury checks, in violation of 18 U.S.C. §§ 371, 510(a)(1) and (2).

The case was tried to a jury over two days. At trial, the prosecution introduced ten original checks made out to Julia A. Jones, one dated July 1, 1992, and the rest covering the months from November 1992 through July 1993. They were each endorsed "Julia A. Jones," under which was Ms. Jaynes's signature and account number. Ms. Jaynes admitted writing both names and her account number on the back of the checks. Following Ms. Jaynes's signature on the back of the check dated December 1, 1992 (but not on the back of any of the other ten checks), were the letters "EXT." The government was not able to obtain original checks for the entire period covered by the indictment. It

---

* Appeal no. 95–6009, *United States v. Larry Dwight Jaynes*, was submitted on the briefs.

** The Honorable Bruce S. Jenkins, Senior District Judge, United States District Court for the District of Utah, sitting by designation.

offered copies of checks dated from January 2, 1987, through August 2, 1993, but many of the copies were illegible, and the trial court did not admit them into evidence. However, the court admitted without objection a list describing the checks.

With respect to the checks that were admitted, the district court, sua sponte, pointed out to the jury that the checks appeared to have a double endorsement—an endorsement by Mrs. Jones, who was dead, and an endorsement by Ms. Jaynes. The court told the jury that it could conclude from its examination of the checks (but did not have to conclude) that there were two different handwritings on the checks. Counsel for Ms. Jaynes moved for a mistrial on the grounds that the court had improperly commented on the evidence, effectively gutting Ms. Jaynes's good-faith defense, by suggesting a theory of deception that the prosecution had not claimed, namely, that Ms. Jaynes had signed her grandmother's name to the checks to make it appear that her grandmother had endorsed the checks. The court denied the motion.

At the close of the government's case, the defendants moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, and they renewed that motion after the jury had retired but before it began its deliberations. The court denied the motion.

April Jaynes was convicted on all three counts of the indictment and sentenced to a prison term of thirteen months plus three years' supervised release on each count, the sentences to run concurrently. Larry Jaynes was acquitted on counts one and two but convicted on count three and was sentenced to six months in prison. Both defendants have appealed. Ms. Jaynes appeals both her conviction and her sentence; Mr. Jaynes appeals only his conviction. The appeals were consolidated. We shall address each in turn.

## II.

## APRIL JAYNES'S APPEAL

### A. Sufficiency of the Evidence

April Jaynes claims that there was insufficient evidence to support her conviction for forgery, uttering and conspiracy.

In reviewing a challenge to the sufficiency of the evidence, we review the record de novo and consider all the evidence—both direct and circumstantial—and all reasonable inferences that can be drawn from it in the light most favorable to the government. *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). We must determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *See, e.g., United States v. Williamson*, 53 F.3d 1500, 1514 (10th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 218, 133 L.Ed.2d 149 (1995). Put another way, the evidence is insufficient to support a conviction if no reasonable juror could have reached the challenged verdict. *Id.* (citation omitted). The evidence necessary to support a verdict "need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *United States v. Parrish*, 925 F.2d 1293, 1297 (10th Cir.1991) (citations omitted). It only has to "reasonably support the jury's finding of guilt beyond a reasonable doubt." *Id.* In reviewing a conviction for sufficiency of the evidence, we cannot weigh conflicting evidence or the credibility of witnesses since "that duty is exclusively delegated to the jury." *United States v. Davis*, 965 F.2d 804, 811 (10th Cir.1992), *cert. denied*, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993). We must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483 (10th Cir.1993) (citations omitted). In viewing the evidence in the light most favorable to the government, "we necessarily resolve any conflicts in the evidence in favor of the government" and assume the jury "found that evidence credible." *Williamson*, 53 F.3d at 1516.

Ms. Jaynes argues that her conviction was not supported by the evidence because there was insufficient evidence of any intent to defraud. An intent to defraud is a necessary element of each count charged in the

indictment.[1] Ms. Jaynes claims that she lacked the requisite intent to defraud because her mother had told her and she believed that the checks were an inheritance from her grandfather and because she made no effort to hide her negotiation of the checks but openly signed her own name on the checks and deposited them into her own account. She claims the evidence showed only an honest mistake regarding her entitlement to the payments, not an intent to defraud the United States.

"An intent to defraud the United States may be shown by an act which the actor knows will interfere with the government's regular payment of funds to a lawful recipient." *United States v. Price*, 795 F.2d 61, 63 (10th Cir.1986). An intent to defraud can be inferred from circumstantial evidence. *See id.* Signing a check in a name other than one's real name tends to establish fraudulent intent. *United States v. Crim*, 527 F.2d 289, 294 (10th Cir.1975), *cert. denied*, 425 U.S. 905, 96 S.Ct. 1497, 47 L.Ed.2d 755 (1976).

Although Ms. Jaynes testified that she honestly thought she was entitled to the annuity checks and did not intend to defraud anyone, the jury was not required to believe her. *See, e.g., United States v. Hager*, 969 F.2d 883, 888 (10th Cir.), *cert. denied*, 506 U.S. 964, 113 S.Ct. 437, 121 L.Ed.2d 357 (1992). There was sufficient circumstantial evidence from which a reasonable jury could have found beyond a reasonable doubt that Ms. Jaynes had the intent to defraud the United States. For example, Ms. Jaynes's husband and Jamie Anglin, Ms. Jaynes's sister, both stated that they knew it was wrong to cash the checks, and Ms. Anglin testified that she told her sister so. Ms. Jaynes herself told Mr. Kingry, the Secret Service agent investigating the case, that she thought it was wrong when she took and deposited the checks. In her written statement to the Secret Service, Ms. Jaynes stated that she did not think it was the correct thing to do and thought it was most likely unlawful but hoped that it wasn't. Yet, by her own admission, she did nothing to determine whether or not she was entitled to keep the annuity checks until 1992 or 1993, when she called the Treasury Department but gave up after being put on hold. Such willful ignorance in the face of an admitted suspicion that what she was doing was wrong is the equivalent of guilty knowledge, and the jury could reasonably infer that her ignorance "was motivated by sufficient guilty knowledge to constitute intent." *See United States v. Stone*, 987 F.2d 469, 472 (7th Cir.1993).

There was also evidence that Ms. Jaynes tried to hide her actions and make them appear legitimate. For example, after her mother died, Ms. Jaynes moved twice, yet she never had the checks sent to her new addresses. Instead, she or her husband had to make a special trip to her former home, which had been boarded up, to pick up the checks from the mailbox. When Agent Kingry asked her why she and her husband had not requested a change of address, she replied that she had not wanted to attract attention by making any change.

---

1. Counts one and two charged violations of 18 U.S.C. § 510(a)(1) and (2), respectively. At the time the defendants were indicted, section 510(a) read:

> Whoever, with intent to defraud—
> (1) falsely makes or forges any endorsement or signature on a Treasury check or bond or security of the United States; or
> (2) passes, utters, or publishes, or attempts to pass, utter, or publish, any Treasury check or bond or security of the United States bearing a falsely made or forged endorsement or signature; shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 510(a) (1988 & Supp. V 1993). Count three charged a violation of 18 U.S.C. § 371, which provided in relevant part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

*Id.* § 371 (1988). To sustain a conviction under section 371, the government must prove at least the degree of criminal intent necessary for the substantive offense. *United States v. Feola*, 420 U.S. 671, 686, 95 S.Ct. 1255, 1264–65, 43 L.Ed.2d 541 (1975). Thus, an intent to defraud was also a necessary element of the conspiracy charge under count three.

Ms. Jaynes admitted that she signed both her grandmother's name and her own name on the checks. There was evidence that the style of the handwriting for the two endorsements was different, from which the jury could infer that the endorsements were meant to give the appearance that two different people had signed the checks.[2] Ms. Anglin, Ms. Jaynes's sister, also testified that she had seen Ms. Jaynes writing "Julia A. Jones" several times on a piece of notebook paper, from which the jury could infer that Ms. Jaynes had practiced the signature to make it look like her grandmother's.[3]

Although we might have reached a different conclusion from the evidence, we cannot say that there was insufficient evidence for a reasonable jury to find Ms. Jaynes guilty beyond a reasonable doubt.

### B. Forgery as a Matter of Law

■ Ms. Jaynes next argues that the trial court erred in denying her motion for judgment of acquittal because she was not guilty of forgery as a matter of law. We review the denial of a motion for judgment of acquittal using the same standard as the trial court. *United States v. Fleming*, 19 F.3d 1325, 1328 (10th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 93, 130 L.Ed.2d 44 (1994). We must view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution. *United States v. Madrigal*, 43 F.3d 1367, 1369 (10th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1808, 131 L.Ed.2d 733 (1995).

■ Ms. Jaynes claims that, by endorsing the checks with her genuine signature, she represented (at least implicitly) that she was authorized to negotiate the check and that,

even if she was wrong in believing she had such authority, she cannot be guilty of forgery because, as a matter of law, a false representation of authority is not forgery. She relies for her argument on a series of "agency endorsement" cases, beginning with our decision in *Selvidge v. United States*, 290 F.2d 894 (10th Cir.1961), which the Supreme Court followed the next year in *Gilbert v. United States*, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962). *See also United States v. Faust*, 850 F.2d 575 (9th Cir.1988); *Asher v. United States*, 480 F.2d 580 (6th Cir.1973). The rule that emerges from these cases is that "one who executes an instrument purporting *on its face* to be executed by him as an agent, when in fact he has no authority to execute such instrument, is not guilty of forgery." *Selvidge*, 290 F.2d at 895 (emphasis added) (quoting 37 C.J.S. *Forgery* § 8, at 38). In all of the cases Ms. Jaynes relies on, however, not only did the defendant endorse the instrument, but also the defendant's endorsement appeared from the four corners of the instrument to be authorized by the named payee. For example, in *Selvidge*, the checks were made out to Selvidge's employer, a corporation, and Selvidge endorsed the employer's name on the back of the checks, followed by the words "By Thelma L. Selvidge." 290 F.2d at 895. In *Gilbert*, the checks were made out to the defendant's clients, Mr. and Mrs. Bartfield, "c/o R Milo Gilbert," and Mr. Gilbert endorsed the checks "Daniel H. Bartfield/Charline R. Bartfield/R. Milo Gilbert, Trustee." 370 U.S. at 651, 82 S.Ct. at 1400. In *Asher*, the checks were made payable to "Betty Asher, Custodian of Betty L. Elliott," and Ms. Asher endorsed the checks "Betty Asher/Betty L. Elliott." 480 F.2d at 581.[4]

---

**2.** Although Ms. Jaynes offered explanations for this circumstantial evidence, the jury was free to reject her explanations. The requirement that we view the evidence in the light most favorable to the government "commands that we assume that the jury in its assessment of credibility did not believe [the defendant's] exculpatory testimony, and we must defer to the jury's prerogative in this area." *Cosby v. Jones*, 682 F.2d 1373, 1382 (11th Cir.1982).

**3.** There was evidence from which the jury could have concluded that Ms. Anglin had a motive to lie—to get even with her older sister for disci-

pline her sister imposed on her after their mother died. However, it was up to the jury to determine the credibility of the witnesses. The jury apparently chose to believe Ms. Anglin, not Ms. Jaynes.

**4.** The endorsement in *Asher* did not itself show any agency relationship, but Ms. Asher was a named payee on the check and was identified on the face of the check as Ms. Elliott's custodian. Although a custodian is not technically an agent, *see* Restatement (Second) of Agency § 14F (1957), one could reasonably assume from the face of the instrument that as custodian for Ms.

The last case Ms. Jaynes relies on is perhaps most instructive. In *Faust,* the defendant endorsed three checks, all made payable to one of the defendant's companies and the Secretary of Transportation. The defendant endorsed the first check by signing his name, his company's name and "Secretary of Transportation," followed by his initials. He endorsed the other two checks by signing the names of the two payees, but without placing his initials next to his signature of "Secretary of Transportation." 850 F.2d at 578. The court held that the endorsement on the first check was an agency endorsement, for which Faust could not be guilty of forgery. *Id.* at 581–82. However, the court upheld Faust's forgery convictions with respect to the other two checks. The court noted that the two checks Faust endorsed "Secretary of Transportation" without adding his initials "present a harder question":

> On the one hand, there is no representation of agency on the face of the check, as there was in *Gilbert* and *Asher.* On the other hand, in offering a check endorsed with the words "Secretary of Transportation," Faust did represent either that the Secretary of Transportation had herself signed the check, or that an agent of the Secretary had signed it. However, there is no indication on the check that *Faust* had signed the check as an agent of the Secretary. Faust's conduct thus amounted at least to a forgery of an agency endorsement. His defense that it was a fraudulent agency endorsement is no defense. A forged endorsement is also a forgery.

*Id.* at 582.

In this case, at least with respect to nine of the ten checks introduced into evidence, there was no indication on the face of the check that Ms. Jaynes was signing the check as an agent for Julia Jones, her grandmother. In fact, there was not even any indica-

tion that Ms. Jaynes and Ms. Jones were related. Ms. Jaynes admits that she wrote her grandmother's name in her normal handwriting but used her stylized signature in writing her own name, so from the face of the checks it appeared that they had been endorsed by two different people—"Julia A. Jones" and "April M. Enos Jaynes." From the face of the checks, they appeared to contain simply blank endorsements by the holders of the instruments—not an agency endorsement. *See* Okla.Stat.Ann. tit. 12A, § 3–205(b) (West Supp.1996). Thus, with respect to nine of the ten checks, Ms. Jaynes's agency-endorsement argument must fail for want of an agency endorsement. *See Ross v. United States,* 374 F.2d 97, 102 (8th Cir.) (where the defendant endorsed Social Security checks in the name of her deceased mother "without embellishment by way of agency or other qualifying designation," she could be guilty of forgery), *cert. denied,* 389 U.S. 882, 88 S.Ct. 130, 19 L.Ed.2d 177 (1967); *United States v. Wilkins,* 328 F.2d 120, 121 (2d Cir.1964) (where a check was negotiated by signing the payee's name without any written indication of agency, the endorser could be guilty of forgery despite an oral representation of authority). *Cf. Jolly v. United States,* 411 F.2d 618, 619 (9th Cir.1969) (where the payee's name had been forged on the back of a check and the defendant then signed his own name without any indication of agency, the defendant could be convicted of uttering a forged check).

The tenth check (that dated December 1, 1992) contained the letters EXT. after Ms. Jaynes's signature. Ms. Jaynes testified that she intended the letters to mean that she had endorsed the check as executrix for her grandmother's estate, and the endorsement could reasonably be so interpreted.[5] There was no evidence that Ms. Jaynes was the executrix of her grandmother's estate.[6]

---

Elliott, an incompetent person, Ms. Asher had authority to negotiate the check on Ms. Elliott's behalf.

**5.** We have not found any dictionary acknowledging "ext." as a recognized abbreviation for "executor" or "executrix." However, the law does not require a defendant to know and use only accepted abbreviations for legal terms. At a minimum, the letters indicated that Ms. Jaynes

had endorsed the checks in some capacity other than her individual capacity.

**6.** Ms. Jaynes was not the executrix or administrator of her grandmother's estate. Her mother, Pat Jones, was. However, Ms. Jaynes was the executrix or administrator of her mother's estate. Ms. Jaynes testified that she thought she had authority, as administrator of her mother's es-

However, that fact is of no moment. If the endorsement purports on its face to be that of an agent, there can be no forgery under the *Gilbert* line of cases, even if the endorser misrepresents his or her authority. We need not determine, however, whether Ms. Jaynes could be guilty of forgery as a matter of law with respect to the December 1, 1992, check, because her conviction would still stand regardless of our resolution of that issue.

 Count one of the indictment charged Ms. Jaynes with forging her grandmother's name on sixty-four Treasury checks, and count two charged her with uttering and passing those same checks. Presumably, the alleged forgeries were all part of a single scheme and thus properly charged in a single count. *See e.g., United States v.*

*Shorter*, 809 F.2d 54, 56 (D.C.Cir.) (it is well established that two or more acts, each of which alone could constitute an offense, may be charged in a single count if they could be characterized as part of a single, continuing scheme), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 35 (1987). In any event, Ms. Jaynes does not contend that count one of the indictment was duplicitous.[7] Where, as here, a single count of an indictment alleges multiple acts or transactions, a conviction will not be disturbed for insufficiency of the evidence if there is sufficient evidence to support conviction on any of the acts charged, *see, e.g., Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970); *United States v. Bruno*, 809 F.2d 1097, 1104 (5th Cir.), *cert. denied*, 481 U.S.

tate, to act as administrator of her grandmother's estate as well.

7. The government's decision to charge Ms. Jaynes with multiple acts of forgery in a single count, although not necessarily duplicitous, raises other problems. It was at least theoretically possible that the jury could have convicted Ms. Jaynes under count one without agreeing unanimously on the particular acts constituting the offense alleged in that count, in violation of Ms. Jaynes's right to a unanimous verdict. However, Ms. Jaynes did not request a specific unanimity instruction below and has not raised that argument on appeal. The trial court instructed the jury generally that its verdict had to be unanimous. "In this circuit, as in most others, 'it is assumed that a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict.'" *United States v. Phillips*, 869 F.2d 1361, 1366 (10th Cir.1988) (quoting *United States v. McClure*, 734 F.2d 484, 494 (10th Cir. 1984)), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2074, 104 L.Ed.2d 638 (1989). *See also United States v. Sasser*, 971 F.2d 470, 477–78 (10th Cir.1992), *cert. denied*, 507 U.S. 924, 113 S.Ct. 1292, 122 L.Ed.2d 683 (1993); *United States v. Bedonie*, 913 F.2d 782, 792 (10th Cir.1990), *cert. denied*, 501 U.S. 1253, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991). Some courts have recognized exceptions to the rule that a general unanimity instruction is sufficient. *See, e.g., United States v. Hiland*, 909 F.2d 1114, 1140 n. 44 (8th Cir.1990) (a specific unanimity instruction is required where a conviction may occur as a result of different jurors concluding that the defendant committed different acts); *United States v. Ryan*, 828 F.2d 1010, 1020 (3d Cir.1987) (a specific unanimity instruction is required where the facts are exceptionally complex, where the allegations

in a single count are either contradictory or only marginally related to each other, where there is a variance between the indictment and the proof at trial, or where there is a tangible indication of jury confusion). Even were we to recognize an exception to the general rule, however, we cannot say on the facts of this case that it was plain error for the trial court not to give a specific unanimity instruction sua sponte. The evidence was the same with respect to Ms. Jaynes's negotiation of all of the checks except for the letters EXT. on the back of one or more but not all of the checks. Ms. Jaynes admitted signing all the checks and denied any fraudulent intent with respect to any of the checks. The only danger of a less-than-unanimous verdict here was that the jurors might have reached different conclusions with respect to the checks containing the purported executrix endorsement. Some of the jurors may have accepted Ms. Jaynes's testimony that she meant the purported executrix endorsement to be an agency endorsement and may have concluded that those checks were not forged. But those same jurors must have necessarily concluded that the checks lacking the purported executrix endorsement were forged, since all of the jurors agreed that Ms. Jaynes committed forgery. On the other hand, while some jurors may have concluded that the checks bearing the purported executrix endorsement supported a forgery conviction, those same jurors could not have rationally concluded at the same time that the checks lacking that endorsement were *not* forged. If Ms. Jaynes had the requisite intent to defraud when she purported to sign as her grandmother's agent, a fortiori she had the requisite intent to defraud when she purported to sign as her grandmother herself. Thus, under the facts of this case, all of the jurors must have necessarily concluded, at a minimum, that Ms. Jaynes committed forgery when she signed the checks lacking the purported executrix endorsement.

1057, 107 S.Ct. 2198, 95 L.Ed.2d 853 (1987), even if other acts charged would not constitute a crime standing alone. We have concluded that the checks lacking the purported executrix endorsement were sufficient to support the charge of forgery. Thus, there was sufficient evidence to sustain Ms. Jaynes's conviction for forgery in violation of 18 U.S.C. § 510(a)(1), even if the checks containing the letters EXT. could not support a charge of forgery as a matter of law.

### C. *Denial of a Mistrial*

Ms. Jaynes argues that the trial court erred by refusing her request for a mistrial after the court improperly commented on the evidence. During the government's case-in-chief, the trial court told the jury that there appeared to be a double endorsement on the back of the checks—one by Mrs. Jones, who was dead, and one by Ms. Jaynes—and that the jury could conclude that there were two different handwritings on the checks. Ms. Jaynes argues that these comments were improper because they suggested the conclusion the jury should reach—a conclusion that ran counter to the prosecution's theory of the case.

 The decision to deny a motion for a mistrial is within the trial court's sound discretion and will only be reversed for an abuse of discretion. *United States v. Novak,* 918 F.2d 107, 108 (10th Cir.1990). "We will find an abuse of discretion if the trial court 'made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Id.* at 108–09 (quoting *United States v. Ortiz,* 804 F.2d 1161, 1164 n. 2 (10th Cir.1986)).

 Federal courts follow the common-law tradition, which allows the trial judge to comment on the evidence. *See Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933). This privilege is not without its limits. The trial judge "may analyze and dissect the evidence, but he may not either distort it or add to it." *Id.* at 470, 53 S.Ct. at 699. "'[D]eductions and theories not warranted by the evidence should be studiously avoided.'" *Id.* (citation omitted). The court's comments on the evidence should not mislead or be one-

sided. *Id.; United States v. Mobile Materials, Inc.,* 881 F.2d 866, 877 (10th Cir.1989), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). The court should make it clear that the jury is not bound by the court's views of the evidence but is free to decide for itself all questions of fact. *United States v. Speir,* 564 F.2d 934, 938 (10th Cir. 1977), *cert. denied,* 435 U.S. 927, 98 S.Ct. 1495, 55 L.Ed.2d 521 (1978).

 Here, the trial court's comments on the evidence were well within the bounds of propriety. The comment was prompted by Ms. Jaynes's cross-examination of the government's chief witness, Agent Kingry. Ms. Jaynes was trying to get Agent Kingry to admit that the way she endorsed and deposited the checks indicated that she was entitled to them. The government objected on the grounds that the question called for a conclusion properly left to the jury. The court sustained the objection and then proceeded to help the jury understand the legal significance of the endorsements on the checks. The court merely pointed out what was obvious from the face of the checks—that they appeared to contain two endorsements, one by Mrs. Jones, the payee, and one by Ms. Jaynes, from which it would appear that they could be properly deposited in Ms. Jaynes's account. The court instructed the jury that it was free to conclude from its examination of the checks that the endorsements were in two different handwritings, but emphasized that it was up to the jury to decide what conclusion to draw; it was not required to find two different handwritings. Ms. Jaynes was still free to argue (as she did) that she had signed both names, intending them to be an agency endorsement and not intending to defraud anyone.

 Ms. Jaynes argues, however, that the comment went beyond the prosecution's theory of the case and suggested a "new and vastly varying theory of the case for which the defendant had not prepared." According to Ms. Jaynes, the prosecution's theory was that she had committed forgery by unlawfully negotiating the annuity checks through false representations to the bank that she was authorized to negotiate the checks, not

by trying to make it appear that her grandmother had endorsed the checks herself. She bases this argument on a single paragraph of the indictment. The section of the indictment alleging overt acts in furtherance of the alleged conspiracy to forge and publish the Treasury checks (count three), alleged that, among other things, the defendants "did represent to the persons cashing the said checks that they had authority to negotiate said checks." That allegation is not found or incorporated in count one of the indictment. Count one alleges that the defendants "did forge the name of Julia A. Jones as endorsement" on the checks. The government's theory with respect to count one was that Ms. Jaynes committed forgery when she signed her grandmother's name on the checks. Ms. Jaynes admitted signing her grandmother's name. The issue, then, was whether she signed the name intending it to look like her grandmother's signature or whether she signed it under a good-faith but mistaken belief that she was authorized to sign it and that the signatures constituted an agency endorsement. The trial court merely told the jury that it could infer the former from looking at the signatures and from the absence of any indication of an agency relationship on the face of most of the checks. The trial court did not expand the government's theory of the case but merely spelled it out for the jury, as the prosecutor confirmed in a sidebar conference. We do not believe the court's comments were so unfair or prejudicial as to deny Ms. Jaynes a fair trial and thus warrant a mistrial.

8. The instruction on the effect of indorsements read:
 Oklahoma law provides:
 "An indorsement in blank specifies no particular indorsee and may consist of a mere signature. An instrument payable to order [as in this case] and indorsed in blank becomes payable to bearer...."
 Thus, if a check is indorsed in blank, the person in possession may cash it or negotiate it further by adding a subsequent indorsement.
 Count 1 of the indictment alleges forgery of Mrs. Jones' signatures. Count 2 alleges an illegal uttering of the checks, which implicates Mrs. Jaynes' signature. On the face of the indorsements, without further explanation, the Jones signature permits deposit through the Jaynes signature.

## D. Jury Instructions

Ms. Jaynes next argues that the trial court erred when it gave two unsolicited jury instructions—one on the "effect of indorsements" [8] and one on "comparison of handwriting." [9]

The trial judge must instruct the jury as required by the law and the evidence, whether the parties request an instruction or not. *United States v. Cooper*, 812 F.2d 1283, 1286 (10th Cir.1987). Trial courts have considerable discretion in formulating jury instructions. Our review is limited to determining whether the instructions as a whole sufficiently cover the issues presented by the evidence and constitute correct statements of the law. *United States v. Davis*, 953 F.2d 1482, 1492 (10th Cir.), *cert. denied*, 504 U.S. 945, 112 S.Ct. 2286, 119 L.Ed.2d 210 (1992). We do not decide "whether the charge was faultless in every particular" but whether the jury was misled and whether it had an understanding of the issues and its duty to determine them. *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1271 (10th Cir.1988) (citations omitted).

Ms. Jaynes does not claim that the instructions did not accurately state the law. Rather, she claims that the instructions emphasized "a set of facts and law that was not a part of the government's theory of the case" and had the effect of directing a guilty verdict as to Ms. Jaynes.

As discussed above, the argument that the contested instructions instructed the jury on

This instruction on the effect of indorsements does not govern the issues of intent to defraud or good faith.
Instruction No. 22 (brackets in original).

9. The instruction on comparison of handwriting read:
 On the backs of the checks in prosecution exhibit 18 appear what purport to be two signatures, that of Mrs. Jones and that of Mrs. Jaynes. As the finders of fact in the case, you may compare the handwriting. You may conclude on the basis of your own examination and without testimony of a handwriting expert that the appearance of the handwriting in the two purported signatures is different. Of course, you need not draw this conclusion. It is up to you to make the comparison and draw your own conclusions.
 Instruction No. 23.

a theory that was not part of the government's theory of the case is based on a misreading of the indictment. The government's theory as to count one was that Ms. Jaynes committed forgery when she signed her grandmother's name on the back of the checks. Ms. Jaynes testified that she did not intend anyone to take the handwritten name as her grandmother's signature, but the jury was not required to believe her testimony. The trial court instructed the jury that it *could* conclude that the appearance of the handwriting on the back of the checks was different but that it was not required to draw that conclusion. The court further instructed the jury that its instruction on the legal effect of the endorsements "does not govern the issues of intent to defraud or good faith." The court specifically instructed the jury on Ms. Jaynes's good-faith defense to the government's claim of intent to defraud. We believe that, taken as a whole, the jury instructions did not effectively direct a verdict for the government but left the jury free to find the facts of the case from all the evidence and to reach the verdict justified by its view of the facts. *Cf. United States v. Gaudin,* —— U.S. ——, ——, 115 S.Ct. 2310, 2316, 132 L.Ed.2d 444 (1995) ("the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence"). It was therefore not reversible error to give the instructions.

### E. *The Statute of Limitations*

Ms. Jaynes argues that the trial court erred in allowing her to be tried and punished on checks that predate the applicable statute of limitations. All of the charges against Ms. Jaynes were subject to the general five-year statute of limitations for noncapital offenses, 18 U.S.C. § 3282. The in-

dictment against Ms. Jaynes was filed on August 3, 1994. It alleged offenses beginning "on or about April 1, 1988," to August 1993. Ms. Jaynes argues that the statute of limitations should have precluded any consideration, either at trial or for sentencing, of checks dated before August 3, 1989, which would have eliminated from consideration seventeen of the sixty-four checks identified in the indictment. According to Ms. Jaynes, only $16,185 in losses occurred within the five-year statute of limitations.

■ The United States claims that the offenses charged in the indictment were continuing offenses, which would mean that the statute of limitations did not begin to run until the last day on which the offenses were committed. *See, e.g., United States v. McGoff,* 831 F.2d 1071, 1079 (D.C.Cir.1987). The district court agreed with the United States and sentenced Ms. Jaynes based on total losses attributable to her of $21,782.

■ Conspiracy, the offense charged in count three of the indictment, is the prototypical continuing offense. *See, e.g., United States v. Massey,* 48 F.3d 1560, 1568 n. 7 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2628, 132 L.Ed.2d 868 (1995); *McGoff,* 831 F.2d at 1078. It is well established that, where an overt act is required for a conspiracy, the statute of limitations on a continuing conspiracy does not begin to run until the last overt act in furtherance of the conspiracy is committed. *See, e.g., Fiswick v. United States,* 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946); *United States v. United Medical & Surgical Supply Corp.,* 989 F.2d 1390, 1398 (4th Cir.1993); *United States v. Jones,* 816 F.2d 1483, 1487 (10th Cir.1987). There was no question here as to when the last overt act was committed and the statute of limitations began to run.[10] As an overt act

10. By contrast, there may have been some question as to when the conspiracy began. There was no evidence that Mr. Jaynes knew of the annuity checks before he and his wife were married. Mr. and Mrs. Jaynes were married in July 1988, some three months after Pat Jones died and Ms. Jaynes began negotiating her grandmother's annuity checks. At the sentencing hearing, counsel for Mr. Jaynes admitted that Mr. Jaynes "came into the scheme" upon marriage. Thus, it would appear that the conspiracy had begun by the time the Jayneses received the

August 1988 annuity check. We need not reach the question of whether a conviction and sentence for conspiracy can be based on acts predating the conspiracy because the defendants have not raised that issue on appeal and any error was not plain error since there was sufficient evidence to convict the defendants on the conspiracy charge even if the dates for the conspiracy were not precisely as alleged in the indictment. *See, e.g., United States v. Powell,* 982 F.2d 1422, 1431 (10th Cir.1992) (a variance between the

in furtherance of the alleged conspiracy to forge and publish forged Treasury checks, the indictment alleged and the uncontroverted evidence at trial established that Mr. Jaynes went to the Jaynes's former residence on August 2, 1993, and removed a check payable to Julia A. Jones from the mail box. Mr. Jaynes was arrested a few minutes later. The statute of limitations on the conspiracy count therefore began to run on August 2, 1993, and the indictment, which was filed August 3, 1994, was well within the limitations period. The trial court therefore did not err in allowing the jury to consider events more than five years before the date of the indictment in convicting Ms. Jaynes on count three.

Because the conspiracy count could legitimately cover transactions more than five years old, the trial court could also consider such transactions in sentencing Ms. Jaynes under count three. The trial court therefore did not err in imposing sentence under count three.[11]

It is less clear whether counts one and two also allege continuing offenses for limitations purposes. Those counts allege that the defendants violated 18 U.S.C. § 510(a) from about April 1988 through August 1993 by forging and passing sixty-four Treasury checks. The district court considered this a classic example of a continuing

offense and opined that it would be "hard to imagine any clearer one." However, a continuing offense is not the same as a scheme or pattern of illegal conduct.[12] "Continuing offense" is a term of art that does not depend on "everyday notion[s]" or "ordinary meaning." *McGoff,* 831 F.2d at 1078. Although a continuing offense "may consist of separate acts or a course of conduct," *see United States v. Benton & Co.,* 345 F.Supp. 1101, 1103 (M.D.Fla.1972), we have counseled against expanding the continuing offense doctrine beyond those cases in which "the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *United States v. Payne,* 978 F.2d 1177, 1180 (10th Cir.1992) (quoting *Toussie v. United States,* 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970)), *cert. denied,* 508 U.S. 950, 113 S.Ct. 2441, 124 L.Ed.2d 659 (1993). Relying on *Toussie,* the Ninth Circuit has concluded that, whether or not a crime is a continuing offense depends on "the nature of the substantive offense, not on the specific characteristics of the conduct in the case at issue." *United States v. Niven,* 952 F.2d 289, 293 (9th Cir.1991). That court has further held that the continuing offense doctrine applies only "where it is contended that the actual conduct of the defendant ended but

---

allegations of conspiracy in the indictment and the evidence presented at trial does not require reversal unless the defendant's substantial rights are affected, and a defendant's substantial rights are not prejudiced "merely because the 'defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment'") (citations omitted), *cert. denied,* 507 U.S. 946, 1041, 507 U.S. 1041, 113 S.Ct. 1356, 1874, 2361, 122 L.Ed.2d 736, 123 L.Ed.2d 493, 124 L.Ed.2d 268 (1993); *United States v. Laykin,* 886 F.2d 1534, 1542–43 (9th Cir.1989) (because time is not a material element of conspiracy, a variance of about four months between the starting date of a conspiracy as charged and the proof adduced at trial was not reversible error as long as the defendants had adequate notice of the charges against them), *cert. denied,* 496 U.S. 905, 110 S.Ct. 2586, 110 L.Ed.2d 267 (1990); *United States v. Hathaway,* 534 F.2d 386, 401 n. 19 (1st Cir.) (a variance between the starting date charged and that proven is not fatal if the con-

spiracy was within the period charged and any discrepancy was insubstantial), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

**11.** The sentence would still be proper even if the conspiracy had not begun until July 1988, a question we do not reach. *See supra* note 10. Ms. Jaynes's sentence on count three was based on a loss of more than $20,000. *See* United States Sentencing Commission, *Guidelines Manual* [hereinafter *Guidelines*] § 2F1.1(b)(1)(E) (1994). The loss attributable to Ms. Jaynes's conduct would still exceed $20,000 even if the loss were calculated from July or August 1988 and not from April 1988, as alleged in the indictment.

**12.** Thus, the fact that counts one and two may allege a common scheme sufficient to make them not duplicitous, *see supra* pt. II.B, does not necessarily mean that they also allege a continuing offense. Separate offenses may be part of a common scheme without being "continuing" for limitations purposes.

the crime continued past that time," not where, as here, "the charged criminal conduct itself extends over a period of time." *United States v. Morales,* 11 F.3d 915, 918 (9th Cir.1993).

We have not found any cases holding forgery to be a continuing offense for limitations purposes.[13] Other courts, however, have held that forgery is not a continuing offense for venue purposes, on the theory that the forging and uttering of a check is complete when the check is presented for payment.[14] *See, e.g., United States v. Rodriguez,* 465 F.2d 5, 10–11 (2d Cir.1972). *But see United States v. Delia,* 944 F.2d 1010, 1014 (2d Cir. 1991) (distinguishing for venue purposes between "making"—that is, the production of— a forged instrument, which can be a continuing offense for venue purposes, and the act of forgery, which is not). *Cf. Nguyen v. INS,* 991 F.2d 621, 624 (10th Cir.1993) (forgeries of two different government checks to the same payee in the same place on two different dates were not part of a single scheme for purposes of deportation) (citing *In re Z,* 6 I. & N. Dec. 167, 168–69 (1954)). We need not decide, however, whether Congress intended repeated violations of the forgery statute, 18 U.S.C. § 510, to be treated as a continuing offense because we conclude that Ms. Jaynes's conviction under counts one and two was proper even if some of the acts alleged in the indictment occurred outside of the limitations period.

▇▇▇▇ Each of counts one and two essentially alleges sixty-four separate acts of forging or passing forged Treasury checks. Ms. Jaynes could be convicted of the offenses charged in counts one and two if she forged or passed any Treasury checks within five years of the date of the indictment, even if some of the alleged acts of forgery and passing forged checks would be barred by the statute of limitations.[15] *See Ledbetter v. United States,* 170 U.S. 606, 612, 18 S.Ct. 774, 776, 42 L.Ed. 1162 (1898) (ordinarily, proof that an offense was committed on any day before the finding of the indictment and within the statute of limitations is sufficient to support a conviction); *United States v. Adams,* 1 F.3d 1566, 1582–83 (11th Cir.1993) (upholding convictions for importing and possessing marijuana with intent to distribute where there was evidence of transactions both within and outside of the limitations period), *cert. denied,* —— U.S. ——, ——, 114 S.Ct. 1310, 1330, 127 L.Ed.2d 660, 677 (1994). *Cf. United States v. Beard,* 713 F.Supp. 285, 291–92 (S.D.Ind.1989) (requiring a bill of particulars to determine whether any of several offenses alleged in one count of an indictment occurred within the statutory period and thus could properly be brought in that count). There was ample evidence that Ms. Jaynes negotiated Treasury checks within the limitations period to support her conviction on counts one and two.[16]

▇▇▇ The question then becomes whether the district court could properly consider any allegedly time-barred acts in imposing sentence under counts one and two. We have previously determined that the statute of limitations does not bar consideration of relevant conduct for sentencing purposes. *See United States v. Neighbors,* 23 F.3d 306, 311

---

**13.** We have held a similar offense—falsely representing a social security number—not to be a continuing offense for limitations purposes. *See Payne,* 978 F.2d at 1180. Other courts have split over whether the analogous offense of embezzling public monies under 18 U.S.C. § 641 can be a continuing offense. Some have held that a section 641 violation cannot be a continuing offense regardless of the language of the charging document, whereas "others have found to the contrary." *See United States v. Silkowski,* 32 F.3d 682, 690 (2d Cir.1994), and cases cited therein. *Cf. United States v. Aliperti,* 867 F.Supp. 142, 147 (E.D.N.Y.1994) (concluding that, where an indictment alleged that the defendants engaged in a single, continuous plan of extortion envisioning multiple payments over several years, Congress would have intended the offense to be treated as a continuing one).

**14.** The federal venue statute provides that a continuing offense can be tried in any district in which the offense was begun, continued or completed. *See* 18 U.S.C. § 3237(a).

**15.** It does not appear from the record that the defendants asked the trial court to instruct the jury that it could not convict the defendants for offenses that occurred more than five years before the date of the indictment.

**16.** All of the original checks introduced into evidence were from the period between July 1992 and July 1993.

(10th Cir.1994). Ms. Jaynes does not contend that any time-barred conduct is irrelevant to any charges on which she was properly convicted. Therefore, the district court did not err in considering that conduct when it sentenced Ms. Jaynes.

### F. *Acceptance of Responsibility*

Finally, Ms. Jaynes argues that the district court erred by failing to reduce her offense level under the sentencing guidelines by two levels for acceptance of responsibility, under section 3E1.1 of the guidelines.[17] The defendant has the burden of proving she is entitled to a reduction under section 3E1.1. *United States v. Nelson,* 54 F.3d 1540, 1544 (10th Cir.1995). A district court has broad discretion to grant or deny a reduction for acceptance of responsibility. We will not reverse the district court's decision unless it is clearly erroneous. *See United States v. Robertson,* 45 F.3d 1423, 1449 (10th Cir.), *cert. denied,* — U.S. —— & ——, — U.S. ——, 115 S.Ct. 2258 & 2259, 116 S.Ct. 133, 132 L.Ed.2d 265, 133 L.Ed.2d 81 (1995). *See also Guidelines* § 3E1.1 commentary, n. 5 ("the determination of the sentencing judge is entitled to great deference on review").

In determining whether a defendant has clearly demonstrated acceptance of responsibility for his offense under section 3E1.1, the court must consider, among other things, whether the defendant has truthfully admitted "the conduct comprising the offense(s) of conviction." *See Guidelines* § 3E1.1 commentary, n. 1(a). The adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.* n. 2. Although Ms. Jaynes admitted the conduct constituting the forgeries, she steadfastly denied any intent to defraud the government—an essential factual element of guilt. She thus "did not admit to committing those crimes." *Nelson,* 54 F.3d at 1545. Where a defendant admits his conduct but claims "he did nothing illegal and had no unlawful intention," thereby putting the government to its proof, his denial is inconsistent with an acceptance of responsibility. *United States v. McCollom,* 12 F.3d 968, 973 (10th Cir.1993). *See also Nelson,* 54 F.3d at 1545. We cannot say the district court clearly erred in denying Ms. Jaynes a reduction in her offense level for acceptance of responsibility.

### III.

### LARRY JAYNES'S APPEAL

Larry Jaynes appeals his conviction on count three of the indictment, the conspiracy count.

Counts one and two of the indictment charged the defendants with forging and passing forged Treasury checks, in violation of 18 U.S.C. §§ 510(a) and 2. Section 2 of title 18 provides that whoever aids or abets the commission of an offense against the United States "is punishable as a principal." The jury was instructed that it could convict Mr. Jaynes on counts one and two if it found that he had aided and abetted his wife in forging and passing the forged Treasury checks. Mr. Jaynes claims that the same acts that would constitute aiding and abetting under counts one and two are also the overt acts necessary to prove the conspiracy alleged in count three. Because Mr. Jaynes was acquitted on counts one and two, he claims he could not be convicted of conspiracy, since the verdicts are inconsistent on their face.

The short answer to Mr. Jaynes's argument is that consistency in verdicts is not required. *United States v. Powell,* 469 U.S. 57, 62–63, 105 S.Ct. 471, 475–476, 83 L.Ed.2d 461 (1984); *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190–91, 76 L.Ed. 356 (1932). *See also United States v. Swafford,* 766 F.2d 426, 429 (10th Cir.1985) (a conspiracy conviction can stand even where the defendant is acquitted of the substantive offenses). This rule has been explained "as a recognition of the jury's historic function, in criminal trials, as a check against arbitrary

---

17. Ms. Jaynes was sentenced under the 1994 guidelines, which provided, "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." *Guidelines* § 3E1.1(a).

or oppressive exercises of power by the Executive Branch." *Powell,* 469 U.S. at 65, 105 S.Ct. at 476–77 (citations omitted). The jury may have thought, for example, that, while technically guilty of aiding and abetting forgery, Mr. Jaynes was not as culpable as his wife and therefore should not have been punished "as a principal." *See* 18 U.S.C. § 2. We must therefore uphold Mr. Jaynes's conviction if there was sufficient evidence to support a guilty verdict on the conspiracy charge. *See Swafford,* 766 F.2d at 430.

██ The evidence showed that Mr. Jaynes knew that his wife was signing her grandmother's name to Treasury checks and negotiating the checks, knew that it was wrong to do so, picked up the checks for Ms. Jaynes at her request and benefited from the proceeds of the checks. We cannot say that no reasonable jury "could rationally have reached a verdict of guilt beyond a reasonable doubt" on the conspiracy count. *See Powell,* 469 U.S. at 67, 105 S.Ct. at 477–78.

AFFIRMED.