# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3436

_____

United States of America

*Plaintiff - Appellee*

v.

Gene Jirak

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa, Waterloo

_____

Submitted: May 17, 2013
Filed: August 28, 2013

_____

Before SHEPHERD, BEAM, and MELLOY, Circuit Judges.

_____

BEAM, Circuit Judge.

Gene Jirak was convicted on five counts: (1) making a false claim for a tax refund on January 9, 2009; (2) making a false claim for a tax refund on March 27, 2009; (3) uttering a forged treasury check on March 9, 2009; (4) mail fraud in January 2009; and (5) aggravated identity theft on January 9, 2009. He appeals his conviction

on multiple grounds. Having jurisdiction under 28 U.S.C. § 1291, we affirm the district court[1] on the substantive matters, but remand with instructions that the district court modify its written judgment to conform to its oral pronouncement of the special condition of supervised release.

## I. BACKGROUND

During the time relevant to this action, from 2005 to 2009, Jirak resided in Winneshiek County, Iowa, and was employed as a factory worker, earning between $32,000 and $35,000 per year. Jirak was married to Jean Jirak, now known as Jean Kingery ("Kingery"), until the two separated in November 2008, and divorced in July 2009. Together the couple's income amounted to approximately $42,000 per year. Between 2006 and 2008, they prepared joint tax returns using a tax preparer, Wayne Miller. On the Jirak's 2005, 2006 and 2007 tax returns, the couple did not report having earned taxable income from investments with financial institutions, nor did they claim financial institutions withheld any income tax on their behalf.

On January 9, 2009, Jirak filed a Form 1040X[2] to amend the 2005 federal joint tax return ("amended 2005 return" or "2005 amendment"). The amended 2005 return appeared to be filed on behalf of Jirak and Kingery, as the return contained Kingery's name, social security number and her forged signature. Five 1099-OID Forms[3] were

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

[2]Form 1040X is used to report changes and corrections to a filed return. Treas. Reg. § 301.6402-3.

[3]A1099-OID Form "is used by issuers of debt obligations that have original issue discount to report," Fed. Tax Coordinator ¶ S-3073 (2d ed. 2013), which "is a reportable form of taxable interest based on the difference between the maturity and issuance prices of a debt instrument." United States v. Marty, No. CIV S-09-0600,

attached to the amended 2005 return, purportedly issued by four separate financial institutions, indicating that each of the named financial institutions withheld income tax due on various investments owned by or financial obligations owed by Jirak. Based on these five forms, Jirak claimed a refund in the amount of $56,999. Jirak did not file a similar amendment with the State of Iowa. Kingery did not have knowledge of the 2005 amendment and testified that she did not give Jirak permission to use her name, social security number or signature.

On March 6, 2009, the Internal Revenue Service ("IRS"), failing to recognize the nature of Jirak's return, issued a refund check in the amount of $69,139.07 (the amount of the requested refund plus interest). Upon receiving the check, Jirak forged Kingery's signature and, on March 10, 2009, deposited it in a joint savings account at Viking State Bank and Trust ("VSB"). VSB placed a hold on the check, despite Jirak's protest.

In March 2009, Kingery received a letter from the IRS alerting her to the 2005 amendment. Kingery called Jirak and inquired about the refund, to which he responded it was none of her business and it did not concern her. Kingery also called the Marine Credit Union, where she knew Jirak held an account, and requested that, if Jirak deposited a refund check with her signature, it should not be cashed because she did not sign the instrument. Kingery, again, phoned Jirak, who, at this point, admitted he had already signed the check and deposited it at VSB. Kingery confirmed with a VSB employee that Jirak deposited a treasury check, and after viewing the check, Kingery signed an affidavit indicating that she did not sign it. VSB did not deposit the check to Jirak's account and returned it to the IRS.

---

2009 WL 2365556, at *3 (E.D. Cal. July 29, 2009); see also Trial Tr. vol. 1 at 25 (Internal Revenue Service employee witness stating that the 1099-OID Form is used to report the difference between the price for which a debt instrument is issued and its stated redemption price at maturity).

As a result of Kingery's phone call with Marine Credit Union, Marine Credit later informed Kingery that Jirak attempted to deposit a State of Iowa tax refund check, made payable to Kingery. The state check, from the 2007 tax year, was automatically issued as a federal offset, unrelated to the 2005 amendment, and was sent to Kingery's former address where Jirak was living in March 2009. After reviewing the check, Kingery signed an affidavit confirming that her signature was forged.

As these events transpired, on February 14, 2009, Jirak met with Miller to prepare his 2008 tax return. Jirak's W-2 Form indicated his income was $34,878 and, during this meeting, Jirak did not provide Miller with any 1099-OID Forms, nor did he indicate any other taxable income. Miller prepared and signed a federal tax return that stated Jirak owed approximately $1,150 in taxes and a state return that showed Jirak would receive a small refund. Jirak left Miller's office with the fully executed state and federal returns, ready to be mailed.

On March 27, 2009, Jirak electronically filed his 2008 federal taxes. Miller testified that the paperwork filed was not the federal return he prepared. The 2008 tax return claimed three financial institutions withheld income tax due on Jirak's alleged investments. Jirak reported his taxable interest was $72,289, and his reported wages amounted to $34,878, entitling Jirak to a $53,787 refund. Jirak did not claim the same on his 2008 state tax return, and filed the state return prepared by Miller. After being alerted of the nature of Jirak's 2005 amended return, the IRS did not issue a 2008 refund.

On January 23, 2012, following Jirak's indictment, his counsel filed a motion seeking to determine Jirak's competency, which the court granted. But, due to Jirak's lack of cooperation, the doctor was unable to offer a conclusion. Then, on February 21, 2012, the government also requested a competency evaluation and the evaluator concluded Jirak had average intellectual functioning, with no mental disease or defect

that rendered him unable to understand that nature and consequences of his trial. Jirak filed numerous pro se motions during the pretrial stage of his case. Specifically, on May 1, 2012, Jirak filed a motion to dismiss his appointed counsel, which the court granted on May 15, 2012. However, the court-appointed counsel continued as standby counsel during the pendency of the case.

Trial was scheduled to begin on June 18, 2012. On that day, during a pretrial conference, Jirak notified the district court that he wanted standby counsel to represent him at trial. The court continued the case until the next day and appointed counsel as Jirak requested. The jury found Jirak guilty on all counts. On July 5, 2012, Jirak filed a motion for judgment of acquittal, asserting that the government failed to present sufficient evidence to establish the elements of the crimes charged, which the court denied. On July 27, 2012, Jirak again requested the district court terminate his counsel. The court granted his motion and, again, counsel continued in a standby capacity. On October 11, 2012, the court sentenced Jirak, proceeding pro se, to a 45-month term of imprisonment and a three-year term of supervised release. Now represented by appointed counsel, Jirak appeals.

## II.    DISCUSSION

### A.    Sufficiency of the Evidence

Jirak challenges the sufficiency of the evidence as to all counts of his conviction. We review the sufficiency of the evidence de novo, construing the evidence in the light most favorable to the verdict and will only overturn the conviction if no reasonable jury could find Jirak guilty beyond a reasonable doubt. United States v. Quevedo, 654 F.3d 819, 822 (8th Cir. 2011). First, Jirak asserts that the government did not offer sufficient evidence to prove he made a false claim on January 9, 2009, and on March 27, 2009, in violation of 18 U.S.C. § 287 (counts one and two). To prove such a violation, the government must show, as the jury was

instructed, that (1) Jirak made and presented to the United States Treasury Department and the IRS a claim against the United States; (2) the claim was false, fictitious or fraudulent; (3) Jirak knew the claim was false, fictitious or fraudulent; and (4) that the claim was material to the United States Treasury Department and the IRS. United States v. Refert, 519 F.3d 752, 757 (8th Cir. 2008); see also 18 U.S.C. § 287; Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit § 6.18.287 (2013). The jury instructions also explained:

> A claim is "false" or "fictitious" if any part of it is untrue when made, and then known to be untrue by the person making it or causing it to be made. A claim is "fraudulent" if any part of it is known to be untrue, and made or caused to be made with the intent to deceive the governmental agency to which it is submitted.

Jury Instruction No. 13.

The evidence indicates that Jirak presented two false, fictitious, or fraudulent claims against the IRS. Testimony from representatives of the financial institutions listed on the OID Forms indicated that Jirak did not have any interest-earning accounts at those institutions; none of the financial institutions withheld the amounts indicated on the forms; and none of the institutions prepared the OID Forms. Thus, there was sufficient evidence for a reasonable jury to find the first two elements of the § 287 claims.

Jirak focuses his argument on appeal concerning counts one and two on the third element, whether he knew the claims were false, fictitious, or fraudulent. Knowledge may be shown by circumstantial evidence alone and it turns, in large part, on the credibility of the witnesses, which is "peculiarly within the province of the factfinder." United States v. Erdman, 953 F.2d 387, 390 (8th Cir. 1992). The record supports the jury's finding that Jirak knew the claims made on the 2005 amendment

and the 2008 return were, at the very least, false or fictitious. Kingery testified that, in previous years, Jirak participated in meetings with the tax preparer to file their joint returns and knew they had no investments earning the alleged taxable income. Jirak also signed and filed prior tax returns without claiming any similar investment income. Even more telling, Jirak did not claim similar investments on his 2005 and 2008 state returns. With regard to Jirak's 2008 return, Miller completed a state and federal return for Jirak, but Jirak did not file that completed federal return. Rather, Jirak submitted a different, electronic return that contained the OID Forms. Finally, Jirak's initial reluctance to tell Kingery of the amended 2005 return is indicative of his knowledge. Taken together, these facts are sufficient to support the jury's finding that Jirak knew the claims were false or fictitious.

Finally, with regard to materiality, a false claim is material if it has a tendency to induce the government to act. United States v. Adler, 623 F.2d 1287, 1291 (8th Cir. 1980). The evidence shows that, based on the 2005 amendment, the IRS did in fact issue a refund, supporting the materiality of the claim. Because the 2008 tax return made claims similar to those on the 2005 amendment, it is reasonable for a jury to conclude that the false claims were of the type that would induce the government to act. Thus, there was sufficient evidence for a reasonable jury to find that the claims were material, and therefore, find Jirak guilty of the § 287 counts.

Next, Jirak challenges the sufficiency of the evidence as to the intent element on the remaining three charges–uttering a false treasury check, mail fraud, and aggravated identity theft–asserting that the government failed to prove that Jirak acted with an intent to defraud. Jirak essentially argues that the "jury failed to consider . . . [that] Jirak took the check . . . issued by the IRS and attempted to deposit [it] in an account still jointly held by his wife." On appeal, however, we do not weigh the credibility of evidence. United States v. Louper-Morris, 672 F.3d 539, 555 (8th Cir. 2012).

With regard to count three, uttering a false treasury check in violation of 18 U.S.C. § 510(a)(2), there was sufficient evidence for a reasonable jury to conclude Jirak acted with an intent to defraud when he attempted to deposit the check issued by the United States Treasury Department in the amount of $69,139.07 after forging Kingery's signature.[4]  See United States v. Jaynes, 75 F.3d 1493, 1499 (10th Cir. 1996) ("An intent to defraud the United States may be shown by an act which the actor knows will interfere with the government's regular payment of funds to a lawful recipient." (quotation omitted)).  As discussed above, Jirak presented the amended tax return using Kingery's name and social security number without her knowledge or permission.  Once Jirak received the treasury check, he did not consult Kingery and forged her signature.  See id. ("Signing a check in a name other than one's real name tends to establish fraudulent intent.").  Further, when Kingery inquired about the amended return, Jirak told her it was none of her business and that it did not concern her.

Likewise, the evidence was sufficient for a reasonable jury to find Jirak guilty of count four, mail fraud in violation of 18 U.S.C. § 1341.[5]  Jirak asserts that the government was required to show Jirak made "a scheme to defraud another out of money, in this case [Kingery], and used the mail to carry out the scheme."  Jirak believes that because he attempted to deposit the money in an account that he owned

_____

[4]Uttering a false treasury check requires the government to prove (1) that Jirak passed a United States Treasury check; (2) that the check bore a forged or falsely made endorsement; (3) that Jirak passed the check with the intent to defraud; and (4) that Jirak acted knowingly and willfully.  United States v. Rosario, 118 F.3d 160, 163 (3d Cir. 1997).

[5]Mail fraud requires the government to prove "(1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud[,] (3) reasonable foreseeability that the mail would be used, and (4) the mail was used in furtherance of some essential step in the scheme."  United States v. Parker, 364 F.3d 934, 943 (8th Cir. 2004).

jointly with Kingery, he lacked the necessary intent to defraud. Jirak misplaces the victim of his fraud here–the victim of Jirak's scheme was the government, not Kingery. Rather, sufficient evidence established, as the government was required to prove, that Jirak violated § 1341 when he sent, through the mail, the amended 2005 return, which falsely represented the tax refund amount. See DeMier v. United States, 616 F.2d 366, 369 (8th Cir. 1980) ("It is enough if [the defendant is] actuated by an intention to defraud the persons to whom the false statements are made." (alteration in original and quotation omitted)). Based on the evidence that Jirak completed and filed a 2005 tax return, but chose to later amend it, misrepresenting the types of income received from fictitious investments, there was sufficient evidence for a reasonable jury to infer that Jirak acted with an intent to defraud. United States v. Behr, 33 F.3d 1033, 1035 (8th Cir. 1994) ("Direct evidence of intent . . . is not required; the requisite intent may be inferred from all the facts and circumstances . . . .").

Finally, as related to count five, aggravated identity theft, Jirak's argument that the evidence did not establish an "intent to defraud" likewise fails because the government was not required to prove an "intent to defraud" on this count. United States v. Hines, 472 F.3d 1038, 1039 (8th Cir. 2007) (per curiam) ("To support a conviction for aggravated identity theft, the government must prove that the defendant (1) knowingly used (2) the 'means of identification' of another person (3) without lawful authority (4) during and in relation to a violation of 42 U.S.C. § 408(a)(7)(B) (misuse of a social security number)."). After reviewing the record evidence, we conclude there was sufficient evidence for a reasonable jury to find Jirak guilty of aggravated identity theft.

## B.     Motion in Limine

Prior to trial, the government filed three motions in limine, and relevant here, the third motion sought to bar admission of evidence of "alleged reliance on the tax advice [Jirak] received."  On appeal, Jirak challenges the district court's decision to grant the third motion in limine, asserting that his intent in offering such evidence was to show that he made the relevant filings in good faith.  Jirak attempted to offer evidence illustrating the advice he received from a purported tax service company known as Liberty Tree.  The district court excluded the evidence, reasoning that it was irrelevant under Federal Rule of Evidence 402 because it was so unreasonable it could not support a good faith reliance defense and that the evidence was inadmissible pursuant to Rule 403 because it presented a danger of confusing the issues for the jury, would cause undue delay and a waste of time.  "We review the district court's evidentiary rulings, including its ruling on motions in limine, for an abuse of discretion."  United States v. Parish, 606 F.3d 480, 486 (8th Cir. 2010).

Jirak insists that a defendant in a criminal tax trial "must be permitted to present evidence showing what he believed the law to be at the time of his alleged criminal conduct."  Jirak contends Cheek v. United States, 498 U.S. 192 (1991), advances his argument. Cheek, however, is distinguishable from this case. In Cheek, the petitioner was charged with six counts of willfully failing to file federal income tax returns in violation of 26 U.S.C. § 7203 and three counts of willfully attempting to evade income taxes in violation of 26 U.S.C. § 7201.  498 U.S. at 194.  The petitioner's defense in Cheek was that he sincerely believed that the tax laws were unconstitutionally enforced, thus he acted without the required willfulness.  Id. at 196.  The Supreme Court recognized that Cheek turned on the definition of willfulness in 26 U.S.C. §§ 7201 and 7203.  Id. at 194.  The Court concluded that willfulness required proof of "voluntary, intentional violation of a known legal duty."  Id. at 201.  The Court further clarified that willfulness requires that the defendant is

aware of the duty, but that the defendant cannot be aware of the duty where there is a good faith misunderstanding, regardless of whether or not that misunderstanding is objectively reasonable. Id. at 202. The Court did, however, distinguish a defendant's good faith belief that he was acting within the law from a defense based on the defendant's views that the tax laws are unconstitutional or otherwise invalid, the latter of which does not support a good faith defense. Id. at 205-06.

Unlike the crimes charged in Cheek, 18 U.S.C. § 287 does not require "willfulness." As the Court in Cheek noted, "[t]he general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system," and Congress can soften the impact of this common law presumption by making "specific intent to violate the law an element" of the crime. 498 U.S. at 199-200. Congress has not done so here. Thus Cheek does not persuade us to conclude that evidence of a good faith belief defense is relevant. See United States v. Hildebrandt, 961 F.2d 116, 118-19 (8th Cir. 1992) (concluding Cheek did not mandate a good faith defense instruction because its holding was premised on the complexity of the tax laws, and the defendant in Hildebrandt was convicted under a statute similar to § 287–18 U.S.C. § 1001).

Moreover, Jirak asserts that he should have been allowed to present the evidence that he relied on Liberty Tree because "[g]ood faith reliance on an expert tax preparer may be a defense to a tax evasion charge, but only if the taxpayer makes complete disclosure of all the relevant facts." United States v. Meyer, 808 F.2d 1304, 1306 (8th Cir. 1987) (citation omitted). Jirak, however, was not charged with tax evasion nor even charged under the Internal Revenue Code. But even assuming, without holding, that reliance on an expert tax preparer is a valid defense to the § 287 claims here, the district court did not abuse its discretion in excluding the evidence as unreasonable, because the advice received was not from an expert tax preparer, as it was not from an attorney or an accountant. McGraw v. C.I.R., 384 F.3d 965, 973 (8th Cir. 2004) ("Good faith reliance on expert advice of a tax preparer (i.e., an

attorney or accountant) may be a defense . . . ."). Nor did Jirak offer evidence indicating he gave the purported expert complete disclosure, as required. Meyer, 808 F.2d at 1306 (noting the defense is only available if the taxpayer made complete disclosure of all of the relevant facts). The evidence offered did not establish the elements of the defense, and thus the district court did not abuse its discretion here. See United States v. Luker, 395 F.3d 830, 833 (8th Cir. 2005) (upholding the grant of a motion in limine to exclude evidence intended by the defendant to establish a defense, where the defendant's proffered evidence failed to satisfy the necessary prerequisites of the defense).

## C.    Motions to Continue

Jirak asserts that the court abused its discretion in denying his multiple motions to continue the trial because it failed to adequately consider the fact that he was proceeding pro se, and, thus, he did not have adequate time to prepare the case. We review a district court's denial of a request for continuance for an abuse of discretion and will only reverse if the moving party was prejudiced by the denial. United States v. Cotroneo, 89 F.3d 510, 514 (8th Cir. 1996). "District courts are afforded broad discretion when ruling on requests for continuances," but "[c]ontinuances generally are not favored and should be granted only when the party requesting one has shown a compelling reason." Id.

Jirak was initially indicted on November 16, 2011, and proceeded with appointed counsel until May 15, 2012. After that Jirak moved to continue twice, both of which were denied. Jirak had over one month to prepare for trial, however, which was sufficient time in this case. Further, on appeal, Jirak does not offer any argument as to how he was prejudiced by the denial, and we see none. Because his appointed counsel remained as standby counsel while Jirak proceeded pro se, counsel was adequately informed and able to represent Jirak at trial. Thus, the district court did

not abuse its broad discretion here.  See United States v. Thurmon, 368 F.3d 848, 852 (8th Cir. 2004) (noting the district court did not abuse its discretion because the appellant failed to show he suffered prejudice).

### D.      Special Condition of Supervised Release

Finally, Jirak asserts that the sentencing court abused its discretion in imposing a "total ban" on his contact with his children as a condition of supervised release. Generally, we review "the imposition of special conditions for abuse of discretion, but when a defendant has failed to properly object to the imposition of the condition at the sentencing hearing," we review for plain error.  United States v. Roberts, 687 F.3d 1096, 1100 (8th Cir. 2012).  The parties disagree on our standard of review, but we need not decide which standard applies here, as the result is the same under either standard.  See United States v. Camp, 410 F.3d 1042, 1044 (8th Cir. 2005).

As the government acknowledges, the sentencing court did not impose a "total ban" on Jirak's contact with his children, but there is a discrepancy between the oral pronouncement of the condition of supervised release and the written judgment.  At sentencing, the court imposed a special condition stating, "you are to have no contact during your term of imprisonment or your term of supervised release with [Kingery] and *her* family members in person or by a third-party."  The written judgment, however, stated that Jirak "shall have no contact during [his] term of imprisonment or [his] term of supervision with [Kingery] and *their* family members, in person or by a third party."  Because of this discrepancy, Jirak reads the condition of supervised release as implementing a total ban on his contact with his children.

The transcript of the sentencing hearing indicates that the court did not intend to impose such a ban, but rather intended to ban Jirak's contact with Kingery.  The court noted that Jirak would "have to work through another family member and have that family member be the intermediary between [his] ex-wife and [himself] to

arrange visitation with [his] children" and went on to state that "the Probation Office will work with [Jirak] in helping [him] set up a mechanism by which [he] can arrange to have visitation with [his] children."  Given this colloquy, and because where an "oral pronouncement and written judgment conflict, the oral sentence controls," we remand with instructions to amend the written judgment to conform to the oral pronouncement of special condition two.  United States v. Morais, 670 F.3d 889, 895 (8th Cir.), cert. denied, 133 S. Ct. 311 (2012).

## III.  CONCLUSION

The judgment of the district court is affirmed, but we remand with instructions that the district court modify its written judgment to conform to its oral pronouncement of special condition two of supervised release.

_____