# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-2460

_____

United States of America,

*Plaintiff - Appellee,*

v.

Kimberly Johnson,

*Defendant - Appellant.*

_____

No. 14-2603

_____

United States of America,

*Plaintiff - Appellee,*

v.

Nkosi Gray,

*Defendant - Appellant.*

_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 13, 2015
Filed: July 31, 2015
_____

Before MURPHY, COLLOTON, and KELLY, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Following a jury trial, Kimberly Johnson and Nkosi Gray were each convicted of one count of making a false claim for a tax refund, in violation of 18 U.S.C. § 287. The district court[1] sentenced Johnson to 48 months' imprisonment and Gray to 60 months' imprisonment. Johnson appeals, challenging the sufficiency of the evidence supporting her conviction. Gray appeals his sentence, arguing that the district court erred under the advisory sentencing guidelines in calculating the intended amount of loss and in applying an increase for an offense that involves sophisticated means. We affirm.

I.

Johnson and Gray were convicted in relation to a tax fraud scheme run by Gerald Poynter. Poynter's scheme was known as an Original Issue Discount scheme. Original Issue Discount forms ("OID" forms, for short) are tax forms designed to report an individual's interest income derived from investments such as municipal bonds and certificates of deposit. In an OID scheme, filers falsely list large amounts of OID income and corresponding large amounts of withholding. Instead of listing actual OID income, the filers list debt, including credit card debts and mortgages.

_____

[1]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri.

The filers also falsely represent that a large amount of their OID income was withheld, and they thus claim that they are entitled to large tax refunds.

Poynter promoted the scheme through conference calls and seminars that he held across the country. In December 2008, Johnson attended one of these seminars at a hotel in Atlanta, Georgia, where Poynter gave a presentation outlining the OID process. On February 10, 2009, Johnson signed a contract with Poynter, in which she agreed to serve as one of his "branch managers" or "affiliates." As a branch manager, Johnson was tasked with recruiting clients who were interested in Poynter's tax services.

Johnson's contract with Poynter gave her the right to set her fee with each client, but she was required to pay him fifty percent of that fee. The contract also included several disclaimers, including a statement that the material provided by Poynter was not legal or tax advice, but instead was intended for educational and informational purposes. By signing the contract, Johnson agreed that she was not an agent of any government agency, including the IRS.

One of the clients whom Johnson recruited while working as a branch manager for Poynter was Marian Fine-Kennedy. In March 2009, Fine-Kennedy sent Johnson a $500 money order to start the process. Before providing her services, Johnson required Fine-Kennedy to sign a contract that contained a non-disclosure provision and listed a $20 million penalty for disclosure. The agreement also required Fine-Kennedy to certify that she was not affiliated with any government agency.

Fine-Kennedy sent Johnson her financial information, and Johnson completed Fine-Kennedy's return for the 2008 tax year. On Fine-Kennedy's 2008 return, Johnson stated that the taxpayer had earned $89,605 in OID income, that $87,492 was withheld, and that Fine-Kennedy was entitled to a $61,959 refund. In reality, however, Fine-Kennedy was unemployed in 2008 and received only disability income

-3-

in the amount of $22,500, none of which was withheld in taxes. Johnson sent part of Fine-Kennedy's prepared tax return to Fine-Kennedy, who mailed it to the IRS. The remaining portion of Fine-Kennedy's return was submitted to the government either by Johnson or by another one of Poynter's associates. The IRS issued Fine-Kennedy a refund in the amount of $61,959. Fine-Kennedy paid Johnson $4117 for her services by depositing the payment in a third party's bank account.

Gray was also one of Poynter's clients. On October 3, 2008, Poynter submitted Gray's 2007 personal tax return, listing income of $401,068 and withholding of $401,067, and requesting a refund of $283,888. Two weeks later, the IRS deposited a $278,874 refund in Gray's bank account, and Gray paid Poynter a fee of $15,000. Gray then proceeded to file additional fraudulent tax returns for other tax years seeking more refunds.

In September 2011, after Poynter's scheme was uncovered, fourteen defendants, including Johnson and Gray, were indicted by a grand jury for their activities related to Poynter's scheme. Johnson was charged with one count of conspiracy to commit tax fraud and nine counts of making, and aiding and abetting the making of, a false claim upon the United States. Gray was charged with one count of conspiracy to commit tax fraud, based on the 2007 tax return, and one count of making a false claim to the United States and aiding and abetting the same. Johnson and Gray proceeded to trial.

At trial, Johnson admitted that while working as a branch manager for Poynter, she prepared her clients' OID returns, including Fine-Kennedy's 2008 tax return. But Johnson also testified that she believed that Poynter's method of filing tax returns was a valid process.

Gray did not testify at trial, but in an August 2010 interview with an IRS agent, Gray admitted that he continued filing additional OID tax returns, even after he was

"bombarded" with frivolous-filing letters from the IRS. The government also produced evidence that on March 6, 2009, Gray forwarded Poynter an e-mail warning him that the Department of Justice was aware of the OID scheme. Gray continued to file false returns after sending Poynter the warning e-mail.

At the close of the government's case, the district court dismissed four of the nine substantive counts against Johnson on the government's motion, but denied Johnson's motion for judgment of acquittal as to the others. The jury convicted Gray of one count of making a false claim, and found him not guilty of conspiracy to commit tax fraud. The jury convicted Johnson on one count of making a false claim, and acquitted her on four other substantive counts and on conspiracy to commit tax fraud. After sentencing and judgment, both Johnson and Gray appeal.

II.

Johnson argues that the evidence was insufficient to support her conviction. We review Johnson's challenge *de novo*, construing the evidence in the light most favorable to the verdict. We will reverse Johnson's conviction only if no rational jury could find her guilty beyond a reasonable doubt. *United States v. Jirak*, 728 F.3d 806, 811 (8th Cir. 2013).

Johnson first argues that the evidence was insufficient to show that she was the but-for cause of submitting the fraudulent return to the government. Because Fine-Kennedy reviewed the return, signed it, and mailed it to the IRS, knowing that her claim was fraudulent, Johnson contends that Fine-Kennedy—not Johnson—was the but-for cause of the filing of the fraudulent return.

The government prosecuted Johnson on a theory that she caused Fine-Kennedy to take an act that would have been an offense if performed by Johnson herself. *See* 18 U.S.C. § 2(b). The offense of making a false claim upon the United States

-5-

required proof that a person made or presented a claim to the Internal Revenue Service, knowing that the claim was false, fictitious, or fraudulent. 18 U.S.C. § 287; *see United States v. Miller*, 728 F.3d 768, 774 (8th Cir. 2013). In this case, the jury was instructed that the government must prove that "Johnson caused to be made to the Internal Revenue Service a claim for a tax refund." The instructions explained that "[a] person makes a claim against the Internal Revenue Service when she files or submits, or causes to be filed or submitted, a tax return requesting a refund of withheld income tax, either for herself or for other persons."

That Fine-Kennedy physically mailed the return and also knew about the fraudulent scheme does not preclude a finding that Johnson caused the filing. Johnson admitted that Fine-Kennedy was her client and that she prepared Fine-Kennedy's fraudulent tax return. Johnson accepted payment from Fine-Kennedy for the completion of her fraudulent tax return. Johnson knew that Fine-Kennedy would submit the return to the government for a refund. Even though Fine-Kennedy ultimately submitted the false return to the IRS, the jury could still find that Johnson caused the submission of a false statement through an intermediary. *United States v. Hebeka*, 89 F.3d 279, 283-84 (6th Cir. 1996); *United States v. Blecker*, 657 F.2d 629, 631-34 (4th Cir. 1981). Fine-Kennedy's act of submitting the return to the government "was clearly understood and foreseen" by Johnson when she prepared the false return, and a reasonable jury thus could find that Johnson "caused" the return to be presented within the meaning of § 2(b). *See United States v. Murph*, 707 F.2d 895, 896 (6th Cir. 1983) (per curiam).

Johnson also argues that the government failed to prove that she knew the tax return she prepared for Fine-Kennedy contained false information. Johnson testified at trial that she did not fully understand Poynter's tax refund process, but that she trusted Poynter because she believed he had lawyers and accountants advising him and ensuring that the process was legitimate. One of Johnson's former clients also testified that he thought Johnson was unaware of the illegality of Poynter's scheme:

"I totally think that [Johnson] was, you know, she didn't realize this was a[n] illegal process in my opinion. I think she was victimized just like we were. . . . I mean, she believed it with all of her heart, I believe." Johnson argues that this testimony shows she did not have the requisite knowledge to be convicted.

Knowledge may be proved by circumstantial evidence, and we believe a reasonable jury could have found that Johnson acted knowingly. Johnson admitted knowing, when she prepared tax returns for clients, that the information entered was debt information, rather than income information. Johnson listed the debt information in a space identified as "taxable interest," and she also falsely stated that substantial portions of the false income had been withheld. Although financial information that Fine-Kennedy gave Johnson for 2008 showed income of only $22,500 from disability payments and no withholding, Johnson prepared a tax return claiming $89,605 in interest income, $87,492 in withholding, and entitlement to a refund of $61,959.

None of the information or documentation that Fine-Kennedy provided to Johnson could have supported the amounts that Johnson claimed on Fine-Kennedy's tax return. A reasonable jury could have inferred from this fact that Johnson knew that the information she entered into the return was false. *See Miller*, 728 F.3d at 774-75; *United States v. Clark*, 577 F.3d 273, 286 (5th Cir. 2009). Johnson claimed that she acted out of a genuine belief that her actions were legal, but the jury heard her testimony and apparently did not believe it. A reasonable jury could have disbelieved Johnson or concluded that her belief was so unreasonable that it did not constitute a justifiable excuse for her conduct. *See United States v. Rifen*, 577 F.2d 1111, 1113 (8th Cir. 1978) (per curiam). We therefore conclude that the evidence was sufficient to sustain the verdict.

Gray challenges the sentence imposed by the district court on the ground that the district court erred in calculating the total intended tax loss. We review a district court's factual findings at sentencing for clear error, and we will affirm the district court's loss calculation "unless it is not supported by substantial evidence, was based on an erroneous view of the law, or the appellate court has a firm conviction that there was a mistake after reviewing the entire record." *United States v. Theimer*, 557 F.3d 576, 578 (8th Cir. 2009).

"[L]oss" is defined as "the greater of actual loss or intended loss." USSG § 2B1.1, comment. (n.3(A)). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1, comment. (n.3(A)(i)). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense," including "pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1, comment. (n.3(A)(ii)). Under USSG § 2T1.1(c)(4), "[i]f the offense involved improperly claiming a refund to which the claimant was not entitled, the tax loss is the amount of the claimed refund to which the claimant was not entitled." If the offense involved a fraudulent or false return, "the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." *Id.* § 2T1.1(c)(1).

At trial, the government presented evidence that Gray submitted eleven false filings to the IRS claiming refunds for the tax years 2005 through 2008. He filed an original return and an amended return for 2005, an original return and two identical amended returns—sent to different IRS processing centers—for 2006, and an original return and two amended returns filed on different dates for 2008. The probation office calculated the intended loss from Gray's offenses by adding together the refund amounts that Gray claimed on each of these eleven filings. The report calculated an intended loss of $1,537,897 and an actual loss of $278,874. Because the intended

loss was greater than the actual loss, the probation office recommended a loss of $1,537,897, which corresponded to a base offense level of 22. *See* USSG § 2T4.1(I).

Gray objected to the inclusion of multiple returns for any given year in the loss calculation. According to Gray, an individual who files an amended return is not intending to receive double refunds because the amended return is intended to take the place of the original return. He therefore argued that only the most recent return that he filed for any given year should be included in the intended loss calculation. Gray also objected to the inclusion of two amended returns that he submitted to different IRS locations for the 2006 tax year. Gray argued that he filed duplicate returns because he was unsure of where to send them, and that only one of these amended returns should be counted in the district court's loss calculation. The district court overruled Gray's objections and adopted the probation office's recommendation.

On appeal, Gray raises the same objections to the district court's calculation of intended loss. He acknowledges intended loss of $753,205, which corresponds to base offense level 20, but argues that the district court clearly erred by counting multiple returns for certain tax years and increasing the base offense level to 22.

The district court did not make an express finding that Gray intended to obtain multiple refunds for tax years 2005, 2006, and 2008, but we infer from the record that the court made the requisite subsidiary finding that Gray intended to receive the refunds claimed in all eleven filings. *See United States v. Patterson*, 946 F.2d 1371, 1372 (8th Cir. 1991). We do not believe that the finding is clearly erroneous. Gray intended to obtain fraudulent refunds from the government, and it was reasonable to infer that he intended to maximize the amount procured. That Gray sent different amended returns to different locations for tax year 2006 supports an inference that he hoped the government would mistakenly pay twice. Although the IRS, of course, does not pay more than one refund per year as a matter of policy, Gray's purpose was

to commit fraud, and his intent was not constrained by IRS practice in dealing with an honest taxpayer. Whether or not Gray was likely to succeed in obtaining refunds based on multiple returns filed for a single tax year, he is still responsible for any false return he submitted to the IRS with the intent to obtain the amount requested in that return.

Gray also challenges the district court's application of a two-level specific offense characteristic under USSG § 2T1.1(b)(2) for an offense that "involved sophisticated means." In explaining its application of the adjustment, the district court found that Gray "participated in the scheme and the concealment of the offense, and that it was complex and intricate."

Gray argues the finding is clearly erroneous because he used his real name and address on his tax returns, filed numerous returns with the IRS, regularly corresponded with the IRS via e-mail and letters, and in no way attempted to shield his identity. Gray also argues that his acquittal on the conspiracy charge shows that the jury did not credit him with any sophistication or participation in the larger scheme of which his substantive offense was a part.

The sophisticated means enhancement applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG 2T1.1, comment. (n.5). It is designed for a defendant whose conduct was more intricate than that of the "garden-variety" offender. *United States v. Hance*, 501 F.3d 900, 909 (8th Cir. 2007); *see United States v. Fiorito*, 640 F.3d 338, 351 (8th Cir. 2011). "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." *United States v. Bistrup*, 449 F.3d 873, 882 (8th Cir. 2006).

Gray submitted eleven false filings to the IRS. He submitted false background documents to the IRS to bolster his claims for tax refunds, and he warned Poynter via

e-mail to alert him that the Department of Justice was aware of the OID tax fraud scheme. The record supports a finding, by a preponderance of the evidence, that Gray's conduct was repetitive and more intricate than that of a garden-variety tax offender. That Gray was acquitted on the conspiracy charge did not preclude the district court from considering conduct beyond the single count of conviction, as long as it was proved by a preponderance of the evidence. *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998). We therefore conclude that the district court did not clearly err in applying § 2T1.1(b)(2).

\*      \*      \*

For the foregoing reasons, the judgments of the district court are affirmed.

_____