FILED
**United States Court of Appeals
Tenth Circuit**

**July 22, 2025**

**Christopher M. Wolpert
Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

EDGAR RENE GARCIA-LIMON,

    Defendant - Appellant.

No. 23-7055

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:21-CR-00032-RAW-1)**
_____

Kathleen Shen, Assistant Federal Public Defender, Office of the Federal Public Defender, Denver, Colorado (Virginia L. Grady, Federal Public Defender, with her on the briefs), for Defendant-Appellant.

Benjamin D. Traster, Assistant United States Attorney, Muskogee, Oklahoma (Christopher J. Wilson, United States Attorney, with him on the briefs), for Plaintiff-Appellee.
_____

Before **TYMKOVICH**, **BALDOCK**, and **EID**, Circuit Judges.
_____

**EID**, Circuit Judge.
_____

    Edgar Rene Garcia-Limon appeals his convictions for aggravated sexual abuse of a minor in Indian Country, in violation of 18 U.S.C. §§ 2241(c), 2246(2)(D), 1151, 1152, and abusive sexual contact in Indian Country, in violation of 18 U.S.C.

§§ 2244(a)(5), 2246(3), 1151, 1152.  He urges vacatur of those convictions on three grounds, each of which relates to his indictment.  Because we identify no deficiencies in Garcia-Limon's indictment, we affirm his convictions.

**I.**

**A.**

This case arose in early 2021, when thirteen-year-old D.C. told her stepmother, Zully Correa, that her stepfather, Garcia-Limon, had sexually abused her.[1]  During the resulting investigation, D.C. described in detail several instances of abuse that occurred when she was between four and eleven years old and alleged generally that the abuse occurred frequently over many years.  D.C. also reported that Garcia-Limon had possessed and fired a gun in the family home, which her siblings corroborated separately.  Based on this information, law enforcement searched the home, discovered two firearms, and arrested Garcia-Limon.

Three FBI agents interviewed Garcia-Limon.  During the interview, Garcia-Limon acknowledged the guns in the home were his.  He also admitted he had sexually touched D.C. in the shower when she was about six years old.  When the agents pressed Garcia-Limon, he described a second incident of sexual touching in the bedroom of his home in Henryetta, Oklahoma, while his wife was out:  He "just

---

[1] At the time D.C. reported the abuse, Garcia-Limon was married to Tracy Garcia (D.C.'s biological mother), with whom he had three biological children—E.G., G.G., and A.G.  He also shared custody of D.C. and R.C.—Tracy's children from a previous marriage—with Juan Correa (D.C.'s biological father) and Zully Correa.

touched D.C." "from the underwear," and "D.C. was right here on top of me and I think that's what happened.  Everything was just rubbing her."  R. Vol. III at 288–89; Gov't Exhs. 37, 39.  Eventually, Garcia-Limon admitted he had sexually touched D.C. on several other occasions, putting his hands down her pants and touching her on the outside of her underwear in her vaginal area.  And when asked how many times the abuse happened, Garcia-Limon claimed he could not remember.  He later told his wife he "[o]nly did it like two times" when D.C. was "eleven and ten."  *Id.* at 298; Gov't Exh. 30.

**B.**

A grand jury indicted Garcia-Limon on charges of four crimes:  (1) possession of a firearm as a felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2); (2) aggravated sexual abuse in Indian Country, in violation of 18 U.S.C. §§ 2241(c), 2246(2)(D), 1151, 1152; (3) abusive sexual contact in Indian Country, in violation of 18 U.S.C. §§ 2244(a)(5), 2246(3), 1151, 1152; and (4) illegal reentry into the United States, in violation of 8 U.S.C. § 1326(a).  Garcia-Limon did not contest Counts One or Four, but took issue with the language of Counts Two and Three.  Count Two alleged:

> Beginning on or about August 14, 2011 and continuing until on or about [July 9, 2019], within the Eastern District of Oklahoma, in Indian Country, the Defendant, **EDGAR RENE GARCIA-LIMON**, did knowingly engage and attempt to engage in a sexual act as defined in Title 18, United States Code, Section 2246, to wit:  intentional touching, directly and not through the clothing, of the genitalia of D.C., an Indian, who had not attained the age of 12 years, with an intent to abuse, humiliate, harass, degrade, and arouse and gratify the sexual desire of any

3

person, in violation of Title 18, United States Code, Sections 2241(c), 2246(2)(D), 1151 and 1152.

R. Vol. I at 870.  Count Three alleged:

> Beginning on or about August 14, 2011 and continuing until on or about [July 9, 2019], within the Eastern District of Oklahoma, in Indian Country, the Defendant, **EDGAR RENE GARCIA-LIMON**, did knowingly engage in and cause sexual contact as defined in Title 18, United States Code, Section 2246, with D.C., an Indian and a person who had not attained the age of 12 years, to wit: intentionally touching, through the clothing, of the genitalia, with an intent to abuse, humiliate, harass, degrade, arouse, and gratify the sexual desire of any person, in violation of Title 18, United States Code, Sections 2244(a)(5), 2246(3), 1151 and 1152.

*Id.*[2]

Garcia-Limon moved to dismiss Counts Two and Three, contending the eight-year date range in each count was "too broad and unspecific" to provide him with fair notice of the charged offenses and that Counts Two and Three were therefore "[c]onstitutionally defective." *Id.* at 583.  He further argued that Counts Two and Three "charge[d] a *single act*," not "a series of sexual acts" or a "scheme to sexually abuse." *Id.* at 678–80.  In his view, to conclude otherwise would give the prosecutor

> license to argue to a jury *whatever* sexual act *he chooses*, or *the jury may choose to believe*, by arguing that illegal acts that purportedly occurred in "at least two different residences" and "over the course of several years" "from the time [D.C.] was four years old" and/or ["]she was . . . five or six years old" or maybe "until she was [eleven] years old . . ." will be sufficient to convict Mr. Garcia.

---

[2] The government amended the indictment twice:  first, to include the sexual abuse allegations; and second, to change the end date of the accusations from August 13, 2019, to July 9, 2019.

*Id.* at 680. Under the circumstances, Garcia-Limon claimed, there was "great risk that the grand jury may have had a concept of the offense different from that which [would] be relied upon by the government before the trial jury." *Id.* at 681.

The district court denied Garcia-Limon's motion, concluding that "[i]n each Count—Two and Three—the [g]overnment has not charged [Garcia-Limon] with a single act of sexual abuse, but with a scheme of sexual abuse." *Id.* at 694. It reasoned that, "[w]hile each count of an indictment is considered a single offense, a single count may include multiple allegations of illegal acts which could have been pled as a single count if the allegations are part of a single, continuous scheme." *Id.* (quoting *United States v. Schneider*, 594 F.3d 1219, 1225 n.4 (10th Cir. 2010)). Thus, the court concluded that Counts Two and Three appropriately charged a scheme of abuse. *Id.* ("Count Two relates to [Garcia-Limon's] alleged scheme of abuse of D.C. for eight years directly and not through the clothing pursuant to §§ 2241(c) and 2246(2)(D). Count Three relates to [Garcia-Limon's] alleged scheme of abuse of D.C. for eight years through the clothing pursuant to §§ 2244(a)(5) and 2246(3)."). The court also denied Garcia-Limon's motion to reconsider, noting that "[w]hen a single count of an indictment alleges multiple acts, 'a conviction will not be disturbed for insufficiency of the evidence if there is sufficient evidence to support conviction on any of the acts charged.'" *Id.* at 796 (quoting *United States v. Jaynes*, 75 F.3d 1493, 1502–03 (10th Cir. 1996)).

5

The trial lasted two days. Garcia-Limon did not contest his guilt on Counts One and Four—possessing a firearm as a felon, and illegal reentry, respectively—and therefore the trial focused primarily on D.C.'s sexual abuse allegations.

### C.

The government presented five witnesses, three of which testified on matters directly related to the alleged sexual abuse.[3] D.C. testified first. Throughout her testimony, D.C. detailed three specific instances of sexual abuse, each of which occurred when she was between four and six years old.

The first instance occurred when D.C. was alone with Garcia-Limon in their apartment in Okmulgee, Oklahoma. D.C. testified that, after her mother left the apartment for a night shift, Garcia-Limon grabbed D.C. by the wrist and pulled her next to him on the couch. She explained that while she was laying on her side, Garcia-Limon pulled down her shorts and her underwear to her knees and rubbed his bare penis "in between [her] legs in her vagina[l area]," but not inside her vagina. R. Vol. III at 130. And she stated that when Garcia-Limon finished touching her, he pushed her away to her room. D.C. never told her mother about the incident.

D.C. next testified about a second instance of sexual abuse that occurred while she and her family were moving from their apartment in Okmulgee to their new home in Henryetta, Oklahoma. D.C. explained that, on moving day, she was left alone in a

---

[3] The government also called R.C., D.C.'s sister, and Captain Roger Posey of the Muskogee County Sheriff's Office to the stand. R.C. focused her testimony on the existence of firearms in the home, and Captain Posey focused his testimony on the jail's policies regarding inmate phone calls.

truck with Garcia-Limon.  And she testified that, while they were in the truck, Garcia-Limon put his hands down her pants and touched her bare vagina.

D.C. reported a third instance that occurred after the family had completed the move to Henryetta.  She explained that, after her mother left to go to the store, Garcia-Limon took D.C. to his bedroom and engaged in similar sexual touching: "[He] made me lie down in the same way that it happened at Okmulgee in the apartment.  We were on our sides.  He was behind me and he used his penis to rub around my vaginal area.  He touched it, but never went inside."[4]  *Id.* at 136.

Although D.C. did not detail the precise time of any other instances of abuse, she testified generally that Garcia-Limon abused her on other occasions in their home after the family returned to Okmulgee in "the same way that [she] described before," *id.*:  Garcia-Limon "would rape [her]," meaning he would have her "lie down on [her] side and then have his penis rub around [her] vaginal area, [her] vagina," *id.* at 145.  D.C. said this occurred frequently—not "every time [her] mother went to the store," but "probably every other time she went to the store"—until D.C. was eleven years old.  *Id.*  At some point after D.C. turned eleven, she firmly refused Garcia-Limon's request to lie down in bed with him during a family gathering, and the abuse stopped.

---

[4] D.C. also described a fourth instance of sexually inappropriate behavior where Garcia-Limon asked if she wanted to see his penis.  D.C. shook her head. Garcia-Limon pulled down his pants and showed D.C.

Later in the trial, Vicki Boan—a forensic investigator—provided expert testimony about how children disclose sexual abuse. Boan explained that children often delay disclosure of sexual abuse for several reasons, including fear of repercussions, a feeling that they are trapped, or a lack of understanding about what has happened. She also testified that children who have experienced sexual abuse often cannot recall the specific dates of the abuse unless those dates are tied to something significant in the child's life, such as a specific event or a time when one parent was frequently absent.

Special Agent David Brown—one of the three FBI agents who interviewed Garcia-Limon after his arrest—also testified. During his testimony, the government introduced an audio recording of Garcia-Limon's own inculpatory statements from the interview, including his admissions that he had (1) touched D.C.'s vulva in the shower while she was naked, (2) touched D.C.'s vulva through her underwear with his hand in his bedroom, and (3) had sexually touched D.C. four or five times in total. The government also played recordings of Garcia-Limon's phone calls from the jail with his wife, during which he admitted he had sexually touched D.C. twice.

Following the close of evidence, the district court instructed the jury on the elements of the charged offenses. With respect to Counts One and Four, the court noted the parties' stipulation that each element of the felon-in-possession and illegal reentry offenses had been met. With respect to Count Two, the court instructed that the government was required to prove, beyond a reasonable doubt: (1) "The Defendant, Edgar Rene Garcia-Limon, knowingly engaged or attempted to engage in

a sexual act with D.C."; (2) "[a]t the time the sexual act occurred, D.C. was younger than 12 years old"; (3) "[t]he sexual act took place within Indian Country in the Eastern District of Oklahoma"; (4) "D.C. is an Indian"; and (5) "Garcia-Limon is a non-Indian."  R. Vol. III at 340–41.  It then defined a sexual act as "the intentional touching not through the clothing of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."[5]  *Id.* at 341.

With respect to Count Three, the court instructed that the government was required to prove, beyond a reasonable doubt:  (1) "The Defendant, Edgar Rene Garcia-Limon, knowingly engaged in or caused sexual contact with D.C."; (2) "[a]t the time the sexual contact occurred D.C. was less than 12 years old"; (3) "[t]he sexual act took place within Indian Country in the Eastern District of Oklahoma"; (4) "D.C. is an Indian"; and (5) "Garcia-Limon is a non-Indian."  *Id.*  It then defined sexual contact as "the intentional touching either directly or through the clothing of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent

---

[5] The district court's reference to two different ages in the instructions for Count Two—twelve years old and sixteen years old—was not error.  The statutory definition of a "sexual act" applicable in this case requires the government to show that the victim was under sixteen years old at the time of the abuse.  18 U.S.C. § 2246(2)(D).  But when the government brings a charge of aggravated sexual abuse of a minor, it must also show that the victim was under twelve years old at the time of the abuse.  *Id.* § 2241(c).

to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."[6]  *Id.* at 342.

The parties then delivered closing arguments.  The government recounted D.C.'s testimony that the abuse "started when she was about four years old and that it continued until she was about eleven."  *Id.* at 346.  It reiterated that D.C. "told you that when she was living with her mother in Henryetta and Okmulgee that on multiple occasions this Defendant would rub his penis against her bare skin, against her vagina."  *Id.* at 345.  And it concluded that D.C. "might not have remembered the exact dates, ages she was, exact times she moved from locations, but she knew what happened to her."  *Id.* at 346.

Throughout its argument, the government did not distinguish between the separate allegations of abuse presented at trial.  Instead, it argued broadly that "[w]hat D.C. describes to you from her testimony is aggravated sexual abuse.  What the Defendant tells you is aggravated sexual abuse.  It doesn't matter if it happened one time, two times, five times.  It's all aggravated sexual abuse."  *Id.* at 352; *see id.* at 350 ("How many times did it happen?  D.C. tells you it happened a lot.  There were multiple times that she tells you, times that she maybe didn't give you specifics on, but she said in addition to the specific ones she gave, there were other times as well.").  The government further defined "the sexual act" that occurred in this case as each instance during which Garcia-Limon "would rub his penis on [D.C.'s] vagina."

---

[6] Garcia-Limon did not contest the location of the abuse alleged in Counts Two and Three (Indian Country) or the parties' Indian status.

*Id.* at 350.  Additionally, the government reminded the jury of Garcia-Limon's statement that he sexually touched D.C. over the clothing.

For its part, the defense argued there were meaningful differences between Garcia-Limon's interview statements and D.C.'s testimony.  It noted that Garcia-Limon had admitted to touching D.C. in the shower, but had also claimed he was trying to clean her and "wasn't thinking rational." *Id.* at 355.  The defense also emphasized the lack of physical evidence corroborating the allegations of abuse, highlighted D.C.'s failure to report the alleged abuse to local child welfare officials during prior investigations of her home, and characterized D.C.'s memories as vague.  Based on these uncertainties, the defense argued "there [was] not sufficient evidence to find [Garcia-Limon] guilty beyond a reasonable doubt of Counts [Two] and [Three]." *Id.* at 358–59.

After the government's rebuttal, the district court sent the jury for deliberation.  The court instructed that the verdict—whether guilty or not guilty—"must be unanimous on each count of the [i]ndictment." *Id.* at 366.  Neither party objected to the instructions, and neither party requested additional instructions.  After deliberation, the jury found Garcia-Limon guilty on all four counts of the indictment, and the district court sentenced him to (1) 120 months on the felon-in-possession charge (Count One), (2) life on the aggravated sexual abuse charge (Count Two), (3) life on the abusive sexual contact charge (Count Three), and (4) twenty-four months on the illegal reentry charge (Count Four).  Each of these sentences was to run concurrently.

11

Garcia-Limon timely appealed his convictions under Counts Two and Three.

## II.

Garcia-Limon urges vacatur of his convictions under Counts Two and Three on three grounds, each of which substantially overlaps.  First, he argues Counts Two and Three "failed to 'apprise [him] with reasonable certainty, of the nature of the accusations against him' and are therefore constitutionally 'defective.'"  Aplt. Br. at 16–17 (quoting *Russell v. United States*, 369 U.S. 749, 765 (1962)).  Second, he claims that neither 18 U.S.C. § 2241(c) nor § 2244(a)(5) authorizes conviction for a scheme or series of multiple acts of sexual abuse and that the district court's contrary ruling rendered Counts Two and Three duplicitous.  And third, he contends that Counts Two and Three were constructively amended to allow conviction on the "uncharged theory" that Garcia-Limon engaged in a scheme of sexual abuse.  Aplt. Br. at 31.  As we explain, all three of Garcia-Limon's arguments fail.

## A.

We consider first Garcia-Limon's claim that Counts Two and Three of his indictment did not sufficiently describe the nature of the charges against him.

We review de novo the sufficiency of an indictment.  *United States v. Bryant*, 664 F.3d 831, 833 (10th Cir. 2012).  In doing so, we employ "practical rather than technical considerations."  *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997).  An indictment "need only meet minimal constitutional standards":  It must "set[] forth the elements of the offense charged, put[] the defendant on fair notice of the charges against which he must defend, and enable[] the defendant to assert a

double jeopardy defense." *Id.* These requirements are rooted in the Fifth Amendment, which ensures indictment by grand jury, and the Sixth Amendment, which guarantees the accused the right "to be informed of the nature and cause of the accusation." U.S. Const. amends. V, VI.

Counts Two and Three satisfy each of these requirements. Each count clearly sets forth the elements of the offense: Each names the victim (D.C., "an Indian"), specifies her age (under twelve years old), establishes a date range (eight years), identifies the location in which the offense occurred (Indian Country), and includes the applicable statutory language describing the offense (intentional touching with a specific intent). Accordingly, Counts Two and Three properly informed the grand jury of each element for which it was required to find probable cause to indict. *See United States v. Sweet*, 107 F.4th 944, 958 (10th Cir. 2024) ("[W]here the indictment quotes the language of a statute and includes the date, place, and nature of the illegal activity, it need not go further and allege in detail the factual proof that will be relied on to support the charges." (quotation omitted)).

Counts Two and Three also adequately notified Garcia-Limon of the charges brought against him. As Garcia-Limon acknowledges, "cases involving child sexual abuse present unique challenges" related to fair notice because "child victims may have [difficulty] . . . recalling precise dates." Aplt. Br. at 23. Accordingly, courts have recognized that "fairly large time windows in the context of child abuse prosecutions are not in conflict with constitutional notice requirements." *Valentine v. Konteh*, 395 F.3d 626, 632 (6th Cir. 2005) (collecting cases).

13

This case is no exception to the rule.  Admittedly, the eight-year period alleged in Counts Two and Three is longer than previous date ranges we have held constitutional.  *See* Aplt. Br. at 23–24 (citing *Hunter v. New Mexico*, 916 F.2d 595, 600 (10th Cir. 1990) (approving a nearly four-year period in a state habeas decision); *Parks v. Hargett*, 188 F.3d 519, 1999 WL 157431, at *4 (10th Cir. Mar. 23, 1999) (concluding a seventeen-month time frame did not prejudice defendant)).  But the adequacy of a date range is necessarily a case-specific inquiry.  And under the facts of this case, the indictment's reference to an eight-year period was sufficient for several reasons.

Garcia-Limon was not charged with a single incident of aggravated sexual abuse and abusive sexual contact; instead, he was charged with engaging in largely the same "sexual act" and the same "sexual contact" with D.C. on numerous occasions over the course of eight years.  *See infra* Part II.B.  Under the circumstances, the charges were clear:  Garcia-Limon had, on multiple occasions, discussed his repeated sexual touching of his stepdaughter with others.  *See* R. Vol. III at 285–92 (detailing Garcia-Limon's statements to the FBI and his wife that he had sexually touched D.C. more than once).  Further, during her forensic interview, D.C. described in detail several instances of abuse that occurred when she was between four and eleven years old and alleged generally that the abuse occurred frequently over many years.  Our precedents do not require prosecutors to outline a

14

specific date for every alleged instance of abuse in the indictment in cases where, as here, the instances were virtually identical and occurred on a regular basis.[7]

For many of the same reasons, Counts Two and Three do not present a double jeopardy problem.  We have previously held that "the entire record, not just the indictment, may be referred to in order to protect against double jeopardy if a subsequent prosecution should occur."  *United States v. Washington*, 653 F.3d 1251, 1261 (10th Cir. 2011) (quotation omitted).  On this record, the government cannot "subsequently charge[] [Garcia-Limon] with the same crimes against [D.C.] during the [eight-year] period" described in the indictment.  *Valentine*, 395 F.3d at 629.  Counts Two and Three thus fulfill two functions in this case:  They permit the government to accommodate a child victim, against whom sexual abuse has been perpetrated repeatedly over a long period, and they simultaneously protect Garcia-Limon from successive prosecutions related to the same conduct against the same victim during that period.

To be sure, prosecutors should be as specific as possible in delineating the dates and times of child sex abuse.  But under the facts of this case, no more was required:  Counts Two and Three "set[] forth the elements of the offense charged,

---

[7] That Garcia-Limon—who told FBI agents and his wife about several incidents of sexual touching—also could not remember the precise dates nor the number of times the sexual touching occurred reaffirms the importance of this principle.  We cannot reasonably expect child victims like D.C.—who testified that the abuse started when she was "about four," R. Vol. III at 346—to recall each instance of abuse where an adult could not do so.  *See id.* at 256–57 (expert testimony explaining that children who have experienced sexual abuse often cannot recall the specific dates of abuse).

put[] [Garcia-Limon] on fair notice of the charges against which he must defend, and enable[d] [him] to assert a double jeopardy defense." *Dashney*, 117 F.3d at 1205. Accordingly, we conclude the indictment was constitutionally sufficient.

**B.**

Garcia-Limon next argues that (1) neither 18 U.S.C. § 2241(c) nor § 2244(a)(5) authorizes conviction for a scheme or series of multiple acts of sexual abuse and (2) the district court's contrary ruling rendered Counts Two and Three duplicitous. Based on the plain text of those statutes and our precedents, we disagree.

**1.**

Both Garcia-Limon and the government raise numerous policy arguments to support their respective interpretations of §§ 2241(c) and 2244(a)(5). "But we start where we always do: with the text of the statute." *Van Buren v. United States*, 593 U.S. 374, 381 (2021). Here, the charging statute for Count Two provides that a person is guilty of aggravated sexual abuse if he "knowingly engages in a sexual act with another person who has not attained the age of 12 years . . . , or attempts to do so." 18 U.S.C. § 2241(c). Relevant here, Congress has defined a "sexual act" as "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." *Id.* § 2246(2)(D).

The charging statute for Count Three provides that a person is guilty of abusive sexual contact if he "knowingly engages in or causes sexual contact . . . with

16

an individual who has not attained the age of 12 years." *Id.* §§ 2244(a)(5), (c). Congress has defined "sexual contact" as "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." *Id.* § 2246(3).

Garcia-Limon argues that the plain text of §§ 2241(c) and 2244(a)(5)—specifically, the phrases "*a* sexual act" and "sexual contact"—proves they authorize conviction only for singular instances of abuse. Aplt. Br. at 26. For support, he cites other statutes through which Congress has expressly criminalized a scheme of multiple acts. *See, e.g.*, 18 U.S.C. § 1343 (wire fraud statute) (criminalizing the transmission of "any writings, signs, signals, pictures, or sounds *for the purpose of executing [a] scheme or artifice*" by "wire, radio, or television communication in interstate or foreign commerce" (emphasis added)); 21 U.S.C. §§ 848, 848(c) (continuing criminal enterprise statute) (criminalizing a "*continuing series* of violations" (emphasis added)). Because Congress did not include similar language in §§ 2241(c) and 2244(a)(5), he claims we should interpret those statutes as withholding authorization to charge a scheme or series of multiple acts.

This reading misses the mark. That some statutes require the government to charge a scheme does not categorically limit the government to charging individual instances of criminal conduct separately under other statutes. Instead, we must look to the text of each statute. Here, to "knowingly engage in a sexual act with another person who has not attained the age of 12 years" could also authorize the conviction

17

of a defendant who, as here, repeatedly engaged in virtually the same "sexual act" with the same victim. 18 U.S.C. § 2241(c); *see* R. Vol. III at 136, 145 (detailing D.C.'s testimony that Garcia-Limon abused her "probably every other time [her mother] went to the store" in "the same way that [she] described before": Garcia-Limon "would rape [her]," meaning he would have her "lie down on [her] side and then have his penis rub around [her] vaginal area, [her] vagina"). The same is true of a defendant who "knowingly engages in or causes sexual contact . . . with an individual who has not attained the age of 12 years." 18 U.S.C. § 2244. Nothing in the statutory text requires the government to charge in separate counts a defendant's repeated, carbon-copy sexual contact with the same victim.[8]

---

[8] To be sure, the statutory text also authorizes the government to charge multiple acts in separate counts. Indeed, because § 2241(c) makes it unlawful to engage in "*a* sexual act," other circuits have held that it criminalizes each individual sex act. For example, in *United States v. Two Elk*, a defendant confessed to having both vaginal and anal sex with a child during a single encounter. 536 F.3d 890, 895 (8th Cir. 2008) (Ebel, J., sitting by designation). A grand jury indicted him on two counts of aggravated sexual abuse—one for the vaginal sex, and one for the anal sex. *Id.* at 895–96. On appeal, the defendant argued that punishment for both types of intercourse "would amount to two punishments for one act, in violation of the Fifth Amendment's Double Jeopardy Clause." *Id.* at 897. The court rejected his argument, reasoning that "aggravated sexual abuse is a separate-act offense" because the statute refers to individual sexual acts and "does not say 'sexual act or acts,' or 'sexual course of conduct.'" *Id.* at 899. Thus, the court concluded that "engaging in multiple sexual acts (as listed in § 2246(2)) . . . would leave the perpetrator susceptible to multiple punishments thereafter." *Id.*; *see United States v. Yazzie*, 743 F.3d 1278, 1294 (9th Cir. 2014) (concluding, under similar circumstances, that the "'allowable unit of prosecution' intended by Congress is each individual sexual act listed in § 2246(2)").

Both *Two Elk* and *Yazzie* indicate that the government *may* charge a defendant with multiple acts of aggravated sexual abuse within the same occasion because the statutory language criminalizes each individual sex act. Accordingly, in this case, the grand jury could have indicted Garcia-Limon in separate counts for each of the

This interpretation is well-supported by caselaw.  Though novel in the sexual-abuse context, courts have frequently upheld the validity of indictments that consolidated several similar acts into a single count in other contexts—even where those acts could have been charged separately.  For example, in *United States v. Klat*, a woman was indicted on two counts of threatening to assault the Clerk of the United States Supreme Court and the Chief Justice of the United States.  156 F.3d 1258, 1260 (D.C. Cir. 1998).  The government's evidence included letters, voicemails, and statements spanning a six-month period.  *Id.* at 1260–61.  Following her conviction, the woman challenged her indictment as unconstitutional, noting that the two counts charged numerous allegedly threatening acts that occurred over several months.  *Id.* at 1266.  But because the letters, voicemails, and statements "all related to [the defendant's] apparent frustration with the Supreme Court's denial of her appeals" and "constitute[d] a common scheme to threaten," the court concluded the indictment was appropriate under the statute.[9]  *Id.*

---

alleged instances of abuse.  Instead, however, the prosecution elected to characterize Garcia-Limon's actions as a continuing course of conduct that represented only a single offense for each count.  And neither *Two Elk* nor *Yazzie* concludes that the government may *only* charge individual instances of abuse separately, and not, as it has done in this case, as a scheme of virtually identical acts.  *See United States v. Root*, 585 F.3d 145, 153 & n.5 (3d Cir. 2009) (applying the same reasoning in the context of charging several years of tax evasion in a single count).

[9] Other circuits have taken a similar approach.  *See, e.g.*, *United States v. Robin*, 693 F.2d 376, 378 (5th Cir. 1982) ("We find that threatening statements could be consolidated into a single count because they were part of a single, continuing scheme that occurred within a short period of time and that involved the same defendant."); *United States v. Alsobrook*, 620 F.2d 139, 142 (6th Cir. 1980) (collecting cases); *id.* ("The determination of whether a group of acts represents a single, continuing scheme or a set of separate and distinct offenses is a difficult one

Our Circuit has also indicated approval of (without expressly adopting) this approach. *See United States v. Jaynes*, 75 F.3d 1493, 1502 (10th Cir. 1996) (presuming that a series of alleged forgeries committed over a five-year period were "all part of a single scheme and thus properly charged in a single count"); *see also id.* (noting in a parenthetical that "two or more acts, each of which alone could constitute an offense, may be charged in a single count if they could be characterized as part of a single, continuing scheme" (quoting *United States v. Shorter*, 809 F.2d 54, 56 (D.C. Cir. 1987))). And notably, the statutes at issue in *Jaynes* did not contain an express authorization to charge (or a prohibition on charging) the offense as a scheme. *See* 18 U.S.C. § 510(a)(1) ("Whoever, with the intent to defraud, falsely makes or forges any endorsement or signature on *a* Treasury check or bond or security of the United States . . . shall be fined under this title or imprisoned not more than ten years, or both." (emphasis added)); *id.* § 510(a)(2) ("Whoever, with intent to defraud, passes, utters, or publishes . . . *any* Treasury check or bond or security of the United States bearing a falsely made or forged endorsement or signature . . . shall be fined under this title or imprisoned not more than ten years, or both." (emphasis added)). Accordingly, we conclude that, by their plain language, §§ 2241(c) and 2244(a)(5)

that must be left at least initially to the discretion of the prosecution."); *United States v. Berardi*, 675 F.2d 894, 898 (7th Cir. 1982) (indictment charging multiple acts of obstruction of justice in a single count was appropriate because the acts "occurred within a relatively short period of time, were committed by one defendant, involved a single witness, and were in furtherance of [the defendant's] solitary object of influencing [an individual] not to reveal" certain information to the grand jury).

20

authorize charging a scheme or series of carbon-copy-type sexual acts in a single count.[10]

## 2.

Still, this rule is not without limitation:  We must assure ourselves that charging Garcia-Limon with a scheme of abuse in Counts Two and Three did not render those counts unconstitutionally duplicitous.  We conclude it did not.

We review de novo the question of whether an indictment is duplicitous. *Washington*, 653 F.3d at 1262.  "An indictment is duplicitous if it 'charges the defendant with two or more separate offenses in the same count.'"  *Id.* (quoting *United States v. Haber*, 251 F.3d 881, 888 (10th Cir. 2001)).  Duplicitous indictments are improper because they "present[] a danger that the jury may convict a defendant although not reaching a unanimous agreement on precisely which charge is the basis for the conviction."  *United States v. Ibarra-Diaz*, 805 F.3d 908, 930 (10th Cir. 2015) (quotation omitted).  This violates the Sixth Amendment guarantee of a unanimous jury verdict.  *See* U.S. Const. amend. VI.

Here, each count of the indictment alleged one offense, carrying one potential punishment.  Count Two alleged that Garcia-Limon repeatedly engaged in "a sexual act" during an eight-year period.  Count Three alleged that Garcia-Limon repeatedly engaged in "sexual contact" during the same period.  Accordingly, the indictment

---

[10] *See generally Valentine*, 395 F.3d at 632–33 (noting that charging virtually identical instances of child sexual abuse in separate counts may raise other concerns, such as difficulty distinguishing between the counts).

was not duplicitous on its face, and we are left to determine only whether the indictment presented a serious danger of a non-unanimous jury verdict.

Garcia-Limon contends that, because the government presented evidence of multiple incidents of sexual abuse at trial, the jury was never required to agree about which of those incidents supported its unanimous verdict. This, he argues, violated the Constitution because it did not require the jurors "to agree about which of the multiple alleged acts of sexual abuse presented at trial was proven beyond a reasonable doubt." Aplt. Br. at 29. Accordingly, Garcia-Limon claims he "may have been convicted 'because [they] agree[d] that the evidence showed he had committed *an* offense, even if it was ambiguous as to which one.'" *Id.* at 29–30 (quoting *United States v. Newell*, 658 F.3d 1, 27 (1st Cir. 2011)). For support, he cites the government's closing argument, in which the government "clearly invited the jury to consider the evidence regarding multiple violations at once . . . without focusing on any specific violation in particular." Reply Br. at 17 (citing R. Vol. III at 346 (urging jurors to consider evidence that Garcia-Limon sexually abused D.C. multiple times "start[ing] when she was about four years old" and "continu[ing] until she was about eleven")).

We agree that the government was required to prove, beyond a reasonable doubt, that Garcia-Limon engaged in at least one instance of aggravated sexual abuse and one instance of abusive sexual contact. But nothing in the record suggests the jury was not unanimous in its verdict. "In this circuit, as in most others, 'it is assumed that a general instruction on the requirement of unanimity suffices to

22

instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict.'" *Jaynes*, 75 F.3d at 1502 n.7 (quoting *United States v. Phillips*, 869 F.2d 1361, 1366 (10th Cir. 1998)). Here, the district court gave a general unanimity instruction. R. Vol. III at 366 ("To reach a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be unanimous on each count of the [i]ndictment."). And while courts may choose to give a special instruction regarding unanimity, that instruction is not necessary where, as here, the facts are not especially complex, the alleged unlawful acts are nearly identical, and the evidence of those acts is largely the same. *See Jaynes*, 75 F.3d at 1502 n.7 (concluding that a "theoretical[] possib[ility]" that the jury could have convicted" the defendant "without agreeing unanimously on the particular acts constituting the offense" did not warrant reversal where the court offered a general unanimity instruction, the defendant did not request a specific instruction, and nothing in the record suggested the verdict was not unanimous on the acts constituting the offense).[11]

---

[11] That Garcia-Limon did not request a specific unanimity instruction below bolsters this conclusion. Before closing arguments, the district court asked both parties whether they had any objections to the jury instructions. Defense counsel approved the instructions, expressly stated he would not be offering any other instructions, and confirmed there were no instructions he had asked for that had not been given. *See Klat*, 156 F.3d at 1267 (concluding that, "[in] the context of the entire indictment and the trial," and where the defendant did not request a special unanimity instruction, "the general unanimity instruction given by the district court sufficed to instruct the conscientious juror that she must agree with the other jurors on what act(s) constituted a threat to assault").

We emphasize that evaluating the danger of a non-unanimous verdict is necessarily a case-specific inquiry. We also recognize that charging a scheme of child sexual abuse may, in other cases, raise serious concerns regarding jury unanimity. But under the facts of this case, we are convinced the jurors remained loyal to their oaths and followed the district court's instructions regarding unanimity. *See generally United States v. Currie*, 911 F.3d 1047, 1061 (10th Cir. 2018) ("We presume the jury follows its instructions in the absence of an overwhelming probability to the contrary." (quotation omitted)); *Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006) ("The jury is presumed to follow its instructions, even when there has been misleading argument."); *Berardi*, 675 F.3d at 899 (rejecting defendant's argument "that the jurors may have relied on different acts in concluding that he was guilty of obstructing justice" because the district court instructed that the jury "must be unanimous in . . . finding that the defendant did at least one of the acts charged"). Accordingly, we conclude Garcia-Limon's indictment was not unconstitutionally duplicitous.

## C.

We turn next to Garcia-Limon's argument that the district court constructively amended the indictment.

We review de novo whether the district court proceedings constructively amended the indictment. *See United States v. Koerber*, 10 F.4th 1083, 1115 (10th Cir. 2021). "It is axiomatic in our legal system that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *United States*

*v. Farr*, 536 F.3d 1173, 1179 (10th Cir. 2008) (quotation omitted).  This principle is rooted in a defendant's "Fifth Amendment right to be indicted by a grand jury on the charges against him and his Sixth Amendment right to receive notice of those charges."  *United States v. Miller*, 891 F.3d 1220, 1237 (10th Cir. 2018).  A variance between the charges brought in the indictment and the charges upon which the conviction rests denies these fundamental guarantees because it destroys the defendant's right to be on notice of the charges brought in the indictment.  *Hunter*, 916 F.2d at 598.

Based on these fundamental principles, we have concluded that district court proceedings constructively amend an indictment when they "broaden[] the possible bases for conviction beyond those found in the operative charging document."  *Miller*, 891 F.3d at 1232.  In making this determination, we consider "the trial evidence, the jury instructions, and the prosecutor's closing argument."  *Id.* at 1231.  "The defendant bears the burden of proof to show that a variance occurred and that it was fatal."  *Koerber*, 10 F.4th at 1115 (quotation omitted).

Garcia-Limon recycles his previous arguments to show the indictment was constructively amended at trial.  First, he argues Counts Two and Three each charge only a single instance of sexual abuse and sexual contact.  Because the government introduced evidence of multiple incidents of abuse, Garcia-Limon claims the jury rested its conviction "on the uncharged theory that he had engaged in a scheme or series of multiple acts of sexual abuse; or based on any one of multiple acts of sexual abuse, regardless of whether that act formed the basis of the counts alleged in the

indictment." Aplt. Br. at 34–35. Relatedly, Garcia-Limon claims the government's evidence and arguments made it possible "that whatever act or acts of sexual abuse formed the basis of the trial jury's conviction was different than the act of sexual abuse that formed the basis of the grand jury's indictments—whatever that act may have been." *Id.* at 36.

These arguments fail now for the same reasons they failed before. *See supra* Parts II.A, II.B. Similarly, Garcia-Limon's contention that key language—"such as 'series of discrete acts,' 'repeated acts,' 'continuous course of repeated conduct,' or any reference to plural 'acts' or 'violations'—appears nowhere in the language of" Counts Two and Three and thus proves a constructive amendment misses the mark. Reply Br. at 21; *see* Aplt. Br. at 34. Both counts referenced the continuing nature of the abuse. *See* R. Vol. I at 870 ("*Beginning on* or about August 14, 2011 *and continuing* until on or about [July 9, 2019] . . . the Defendant . . . did knowingly engage and attempt to engage in a sexual act." (emphases added)); *id.* ("*Beginning on* or about August 14, 2011 *and continuing* until on or about [July 9, 2019] . . . the Defendant . . . did knowingly engage in and cause sexual contact." (emphases added)). And though the indictment did not otherwise state that the government was charging Garcia-Limon with a "continuing scheme" of sexual abuse, it did not need to. *See United States v. Schneider*, 594 F.3d 1219, 1226 n.5 (10th Cir. 2010) ("A specific allegation within the count that a single continuing scheme exists is not necessary.").

Most importantly, the evidence introduced during trial matches the conduct alleged in the indictment. At trial, D.C. testified that Garcia-Limon repeatedly abused her in "the same way that [she] described before," R. Vol. III at 136: Garcia-Limon "would rape [her]," meaning he would have her "lie down on [her] side and then have his penis rub around [her] vaginal area, [her] vagina," *id.* at 145. By D.C.'s account, this occurred frequently—not "every time [her] mother went to the store," but "probably every other time she went to the store"—until D.C. was eleven years old. *Id.* This testimony accords with the language of Count Two, which accused Garcia-Limon of (1) knowingly touching D.C.'s genitalia, (2) directly and not through the clothing, (3) in Indian Country, (4) before she was twelve years old, (5) with an intent to abuse. *See* R. Vol. I at 870 (detailing the aggravated sexual abuse charge).

Similarly, the jury heard Garcia-Limon's interview with the FBI and his phone call with his wife, in which he described rubbing his penis over D.C.'s underwear. This accords with the language of Count Three, which accused Garcia-Limon of (1) knowingly touching D.C.'s genitalia, (2) through the clothing, (3) in Indian Country, (4) before she was twelve years old, (5) with an intent to abuse. *See id.* (detailing the abusive sexual contact charge). Based on the "trial evidence, the jury instructions, and the prosecutor's closing argument," we are convinced that the "bases for conviction" presented at trial match "those found in the operative charging document." *Miller*, 891 F.3d at 1231–32. Accordingly, we conclude Garcia-Limon has not shown his indictment was constructively amended.

27

**III.**

For the foregoing reasons, we AFFIRM Garcia-Limon's convictions under Counts Two and Three of the indictment.